

1   CALDWELL LESLIE & PROCTOR, PC
    MICHAEL J. PROCTOR, State Bar No. 148235
2   *proctor@caldwell-leslie.com*
    ROBYN C. CROWTHER, State Bar No. 193840
3   *crowther@caldwell-leslie.com*
    1000 Wilshire Boulevard, Suite 600
4   Los Angeles, California  90017-2463
    Telephone: (213) 629-9040
5   Facsimile: (213) 629-9022

6   Attorneys for Plaintiffs
    MICHAEL N. JONES, JILL JONES, and G.J.

7

FILED
CLERK, U.S. DISTRICT COURT

APR – 5 2011

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

8           UNITED STATES DISTRICT COURT
       CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

9   MICHAEL N. JONES, an individual;          Case No. **CV11- 02851** SJO (JCx)
    JILL JONES, an individual; and G.J., an
10  individual,                               **COMPLAINT FOR**
                                              1) **FALSE IMPRISONMENT,**
11             Plaintiffs,                     2) **INTENTIONAL INFLICTION**
                                                 **OF EMOTIONAL DISTRESS,**
12      v.                                     3) **NEGLIGENCE,**
                                              4) **DECEIT,**
13  COUNTY OF LOS ANGELES;                    5) **VIOLATION OF TITLE 42**
    LOS ANGELES COUNTY                           **U.S.C. SECTION 1983 (FOURTH**
14  DEPARTMENT OF CHILDREN AND                   **AMENDMENT),**
    FAMILY SERVICES; THE OFFICE OF           6) **VIOLATION OF TITLE 42**
15  COUNTY COUNSEL FOR                           **U.S.C. SECTION 1983**
    LOS ANGELES COUNTY; CITY OF                  **(SUBSTANTIVE DUE**
16  SANTA MONICA; CITY OF SANTA                  **PROCESS),**
    MONICA POLICE DEPARTMENT;               7) **VIOLATION OF FEDERAL**
17  CLAUDIA WANG, an individual;                 **CONSTITUTIONAL RIGHT TO**
    SHAWN RIVAS, an individual;                  **BE FREE FROM COERCIVE**
18  DEBORAH RAMIREZ, an individual;              **INTERROGATION,**
    YOLANDA JOHNSON, an individual;         8) **VIOLATION OF STATE**
19  SUSAN LAND, an individual;                   **CONSTITUTIONAL RIGHT TO**
    AMIR PICHVAI, an individual;                 **BE FREE FROM COERCIVE**
20  PETER ZAMFIROV, an individual;               **INTERROGATION,**
    RUSSELL GRIMMOND, an individual;        9) *MONELL* **CLAIMS,**
21  LESLIE TRAPNELL, an individual; and    10) **VIOLATION OF STATE**
    LLOYD GLADDEN, an individual,               **CONSTITUTIONAL RIGHT TO**
22                                               **BE FREE FROM**
               Defendants.                       **UNREASONABLE SEARCH**
23                                               **AND SEIZURE,**
                                              11) **VIOLATION OF STATE**
24                                                **CONSTITUTIONAL RIGHT TO**
                                                  **FAMILIAL ASSOCIATION,**
25                                            12) **WELFARE & INSTITUTIONS**
                                                  **CODE SECTION 309 (FAILURE**
26                                                **TO COMPLY), AND**
                                              13) **VIOLATION OF CALIFORNIA**
27                                                **CIVIL CODE SECTION 43**

28                                            **JURY TRIAL DEMANDED**

CALDWELL
LESLIE &
PROCTOR
                                                                      COMPLAINT

**INTRODUCTION**

1.      On February 24, 2010, Jill Jones ("Jill") experienced a terrible accident: she fell down the stairs of her home while carrying her infant son, G.J., which caused G.J. to slip out of her arm and hit his head on a stair below. Distraught, Jill rushed G.J. to the hospital to discover that G.J. had suffered a serious fracture of his skull.  Fortunately, G.J. would fully recover from his injuries.

2.      When Jill brought G.J. to the University of California, Los Angeles ("UCLA") emergency room that fateful evening, her sole concern was for her child's welfare.  She had no notion that she and her husband, Michael Jones ("Michael"), were about to step into a parent's worst nightmare of being falsely accused of physically abusing their child and having G.J. taken from them for months before a court eventually exonerated them.  The nightmare was initiated by a UCLA physician, Dr. Claudia Wang, who appeared determined to accuse Jill and Michael of child abuse, despite a lack of medical evidence to justify her conclusion. But a cast of other actors, including hospital staff, police officers, social workers, and County Counsel all utterly failed to perform their essential duties of investigating such serious allegations, and protecting the rights of the parents and child against false allegations of child abuse.  By abdicating their duties, the Defendants caused G.J. to be stripped from his parents' care, without cause, for months—precious time in a young child's life that Jill, Michael, and G.J. cannot recover.

3.      Ironically, the only "evidence" of G.J.'s physical abuse relied on by Wang was a result of UCLA's own failure to properly diagnose G.J.'s injuries. When G.J. was first admitted to UCLA, doctors quickly determined that G.J. had a skull fracture, but they failed to discover rib fractures, which, significantly, were not displaced at the time.  The rib fractures, like the skull fractures, were the result of the fall.  Despite the fact that Jill repeatedly reported to UCLA medical personnel that she heard popping sounds in G.J.'s chest, a certain indication of rib fractures,

1 the UCLA physicians failed to do standard tests that would have revealed rib
2 fractures.

3     4.    UCLA's failure to diagnose rib fractures would not have posed a
4 significant problem but for the fact that Wang, a UCLA physician who led UCLA's
5 child abuse review team, decided, days after G.J. had been discharged from the
6 hospital, to further review G.J.'s injury for signs that it was not accidental.  To do
7 so, Wang directed Jill to bring G.J. back to the hospital under false pretenses.

8     5.    During the second visit, a full skeletal exam revealed G.J.'s rib injuries
9 from the fall, which had since become displaced and therefore more easily
10 recognized.  Soon thereafter, Wang falsely concluded, without any credible medical
11 evidence, and likely in an effort to confirm her preconceived notions, that the rib
12 fractures occurred more recently than the skull fracture and were therefore evidence
13 of child abuse.  She then reported her false allegations of suspected child abuse to
14 the City of Santa Monica Police Department ("SMPD") and the Los Angeles County
15 Department of Children and Family Services ("DCFS").

16     6.    The fact that Wang was an overzealous and false reporter of child
17 abuse who misattributed G.J.'s injuries should not have resulted in G.J. being taken
18 away from his parents, if only the government agencies (including SMPD, DCFS,
19 and The Office of County Counsel for Los Angeles County ("County Counsel") had
20 done their job.  Each of these agencies has duties and obligations to conduct
21 thorough, objective investigations of child-abuse allegations, and to duly protect the
22 civil liberties of the accused before taking the extraordinary steps of removing a
23 child from the parents' custody.

24     7.    This case, however, reflects the systemic failure at every level, and by
25 every agency, which permitted Wang to circumvent and manipulate the checks
26 intended to protect against malicious and baseless accusations of child abuse and
27 resulted in the unlawful detention of G.J.

28

CALDWELL
LESLIE &
PROCTOR

-2-

COMPLAINT

8.     Despite the fact that Wang initiated the child-abuse claim against Jill and Michael—while simultaneously refusing ever to state definitively that G.J.'s injuries were not accidental—DCFS abdicated its duties by not conducting an independent investigation and instead deferring *entirely* to Wang's baseless, equivocal, and contradictory conclusions.  DCFS agreed on multiple occasions to unlawfully detain G.J., including, but not limited to, using its authority to detain G.J. in the hospital, without court order, despite the fact that no exigent circumstances existed to justify such a detention.  *DCFS even forged official detention documents in an effort to placate Wang.*

9.     The SMPD abdicated its duties by failing to protect the civil liberties of the Joneses and, instead, overtly assisted Wang's personal crusade by unlawfully detaining G.J. and later permitting Wang to conduct a custodial interrogation of Jill without alerting Jill to her *Miranda* rights.

10.     County Counsel abdicated its duties by not only failing to objectively review the specious evidence set forth by Wang and blindly relied on by DCFS, but also by relying upon forged DCFS documents that ordered G.J.'s detention, and intentionally misrepresenting the evidentiary record to the Court of Appeal.

11.     Because Wang rushed to judgment in making her false claim of child abuse and improperly involved herself in the child abuse investigation after making her report, and because City and County agencies wholly failed to perform their duties and protect the civil liberties of the Joneses, G.J. was removed from his parents' custody for more than two months, until the court ultimately held that Wang's accusations were baseless and expressly criticized Wang for manipulating her story in a desperate attempt to seek G.J.'s detention.  In fact, at the conclusion of the detention hearing, the Commissioner said that it was the first time in nearly twenty years of hearing such cases that she observed a physician alter her testimony while the parents' testimony remained consistent from beginning to end.

12.    The removal of G.J. from his parents' custody was emotionally devastating for the Joneses and also caused Jill to lose the ability to breastfeed G.J. In addition, the months of scrutiny that Jill and Michael faced from their extended family and co-workers as falsely accused child abusers were humiliating and emotionally scarring.

## JURISDICTION

13.    Plaintiffs assert that this Court has jurisdiction, pursuant to 28 U.S.C. § 1331, over Plaintiffs' claims asserted under 42 U.S.C. § 1983 for violations of Plaintiffs' rights under the United States Constitution, including those under the Fourth, Fifth, and Fourteenth Amendments. In addition, Plaintiffs assert that the Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over Plaintiffs' claims asserted under the California Constitution and California State laws.

## PARTIES

14.    At all times relevant to this Complaint, Plaintiffs were residents of Los Angeles County, California. Plaintiff MICHAEL N. JONES is the father of minor Plaintiff G.J., and Plaintiff JILL JONES is the mother of minor Plaintiff G.J. At the time the incident giving rise to the causes of action in the Complaint began, Plaintiff G.J. was two and a half months old.

15.    At all times applicable herein, Defendant COUNTY OF LOS ANGELES was and is a public entity.

16.    At all times applicable herein, Defendant LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES was and is a subdivision or entity of the COUNTY OF LOS ANGELES.

17.    At all times applicable herein, Defendant THE OFFICE OF COUNTY COUNSEL FOR LOS ANGELES COUNTY was and is a subdivision or entity of the COUNTY OF LOS ANGELES.

18.    At all times applicable herein, Defendant CITY OF SANTA MONICA was and is a public entity.

19.   At all times applicable herein, Defendant CITY OF SANTA MONICA POLICE DEPARTMENT was and is a subdivision or entity of the City of Santa Monica.

20.   At all times applicable herein, Defendant CLAUDIA WANG was an individual residing, on information and belief, in the County of Los Angeles, and an officer, agent, and employee of The Regents of the University of California, working at the UCLA Medical Center in Westwood.

21.   At all times applicable herein, Defendant SHAWN RIVAS, a DCFS child social worker, was an individual residing, on information and belief, in the County of Los Angeles, and an officer, agent, and employee of the County of Los Angeles and DCFS.

22.   At all times applicable herein, Defendant DEBORAH RAMIREZ, a DCFS senior child social worker, was an individual residing, on information and belief, in the County of Los Angeles, and an officer, agent, and employee of the County of Los Angeles and DCFS.

23.   At all times applicable herein, Defendant YOLANDA JOHNSON, a DCFS senior child social worker, was an individual residing, on information and belief, in the County of Los Angeles, and an officer, agent, and employee of the County of Los Angeles and DCFS.

24.   At all times applicable herein, Defendant SUSAN LAND was an individual residing, on information and belief, in the County of Los Angeles, and an officer, agent, and employee of The Regents of the University of California, working as a social worker at the UCLA Medical Center in Westwood.

25.   At all times applicable herein, Defendant AMIR PICHVAI was an individual residing, on information and belief, in the County of Los Angeles, and an agent of the County of Los Angeles and County Counsel.

26. At all times applicable herein, Defendant PETER ZAMFIROV, an officer with the SMPD, was an individual residing, on information and belief, in the County of Los Angeles, and an officer, agent, and employee of the City of Santa Monica and the SMPD.

27. At all times applicable herein, Defendant RUSSELL GRIMMOND, an officer with the SMPD, was an individual residing, on information and belief, in the County of Los Angeles, and an officer, agent, and employee of the City of Santa Monica and the SMPD.

28. At all times applicable herein, Defendant LESLIE TRAPNELL, a detective with the SMPD, was an individual residing, on information and belief, in the County of Los Angeles, and an officer, agent, and employee of the City of Santa Monica and the SMPD.

29. At all times applicable herein, Defendant LLOYD GLADDEN, a detective with the SMPD, was an individual residing, on information and belief, in the County of Los Angeles, and an officer, agent, and employee of the City of Santa Monica and the SMPD.

30. Plaintiffs are ignorant of the true names and capacities of those Defendants sued herein as DOES 1 through 20, and for that reason have sued such Defendants under fictitious names.

31. Plaintiffs are informed and believe and on such basis allege that at all relevant times, Defendants, and each of them, were the knowing agents and/or alter egos of one another, and/or the Defendants directed, ratified, and/or approved the conduct of each of the other Defendants and each of their agents or employees, and are therefore vicariously liable for the acts and omissions of their co-defendants, their agents and employees, as more fully alleged herein.

## GENERAL ALLEGATIONS

32. Jill and Michael are both lawyers who met on their first day as law students at Boalt Hall, Berkeley School of Law. Jill, an academic All-American and

1  varsity volleyball player at the University of Massachusetts, where she double-

2  majored in English and Political Science and was named one of the Top Ten College

3  Women by *Glamour* Magazine in 1999, was awarded a Master's in Sociology of

4  Law before she went to law school. Michael was awarded a Bachelor's (First Class

5  Honors) from Oxford University in his native England and a Ph.D. from Stanford

6  University. Prior to law school, he was awarded many prestigious fellowships and

7  academic prizes, taught Literature at Fordham and Stanford universities, and

8  published in the field of Medieval Literature. Michael and Jill married in 2008 after

9  moving from Northern California to Los Angeles, where Jill accepted her dream job

10  in the social services division at County Counsel and where they would be closer to

11  Jill's parents, siblings, and extended family. They are both members in good

12  standing of the California Bar.

13       33.    In 2009, Jill and Michael learned they were expecting their first baby,

14  who would be named G.J. Jill was still working at County Counsel for DCFS when

15  she became pregnant with G.J., and Michael was an associate lawyer at the law firm

16  of Greenberg Traurig, LLP.

17       34.    G.J. was born at UCLA Medical Center in Santa Monica at 36 weeks-

18  gestation on December 9, 2009, via cesarean section because doctors suspected he

19  had a heart condition and Intrauterine Growth Restriction. Both G.J. and Jill were

20  released from the hospital four days after he was born. Doctors' initial concerns

21  were allayed, and G.J. was given a clean bill of health.

22       35.    G.J. is the first baby for Jill and Michael. Like most first-time parents,

23  they were thrilled at G.J.'s arrival and quickly bonded with their son. Both Jill and

24  Michael took leave from their jobs to stay home with G.J. in his first weeks, and

25  they each took responsibility for the various tasks that accompany raising a

26  newborn. While Michael returned to work following his paternity leave in January

27  2010, Jill remained on maternity leave and cared for G.J. full-time.

28

CALDWELL
LESLIE &
PROCTOR

COMPLAINT

36.    Jill treasured her time at home with G.J.  She regularly nursed G.J. and quickly settled into a regular schedule with his feedings and naps.  G.J. was a happy baby, and Jill and Michael were proud parents.

37.    Over the two months following his birth, G.J. saw doctors on a regular basis.  He had follow-up appointments to check on his possible heart condition, and doctors ultimately concluded that his cardiac function was normal.  In addition, like many new parents, Michael and Jill closely monitored their son's health and contacted their pediatrician at the sign of even minor symptoms.  For example, Jill took G.J. to his pediatrician after he developed a cough.  Jill also brought G.J. to his pediatrician to make sure he was healthy enough to fly with Jill and Michael to San Francisco.  Over the mere two and half months following his birth, Jill brought G.J. to his pediatrician and other physicians on multiple occasions for various check-ups and, on each occasion, G.J. was given a clean bill of health, and absolutely no signs of child abuse were ever detected or reported.

### G.J. Is Injured When Jill Accidentally Falls

38.    Wednesday, February 24, 2010, began as a typical day in the Joneses' household.  Michael left for work, and Jill took care of G.J., who was two and a half months old at the time.  Jill had arranged to meet her sister and her nephews at The Grove shopping center in mid-town Los Angeles.  Despite the day being overcast and slightly rainy, Jill and G.J. traveled to The Grove.  Jill and G.J. returned home in the early afternoon.

39.    After they arrived back home, Jill began making dinner and gave G.J. a bath once he woke up from his nap.  After G.J. fell back asleep, Jill briefly checked her email in the Joneses' office, which is located upstairs from the Joneses' kitchen. Jill heard G.J. wake up, and she went to the den, where he was sleeping in his car seat.  She picked up G.J. and then returned upstairs, G.J. in her arms, to finish checking her email until the dinner was ready.

CALDWELL
LESLIE &
PROCTOR

-8-

40.    Jill nursed G.J., and he fell back asleep in her arms.  At that point, Jill headed downstairs, carrying G.J., to check on her meal.  Jill recalls positioning G.J. in her left arm, with his head nestled in her left elbow, as she walked down the wood staircase leading from the computer room to the main floor with the kitchen.

41.    As she descended the stairs, Jill slipped suddenly and, as she fell, G.J. slipped out from her arm and fell to the bottom of the staircase.

42.    Jill was understandably panic-stricken and rushed downstairs to pick up G.J.  She recalls screaming hysterically as G.J. did the same.  She immediately decided to take G.J. to the emergency room and knew that she could get to the Santa Monica UCLA Medical Center ("UCLA-Santa Monica") emergency room faster by driving herself rather than by ambulance.  Jill quickly placed a call to Michael, who was at work, to inform him that she and G.J. had fallen and that she was taking him to the emergency room.  Jill saw G.J.'s car seat in the living room, placed G.J. in it, and raced outside toward her car.  When she got outside, however, she realized that she could not find her car keys and, at that point, intended to run, carrying G.J. to the hospital two blocks away.

43.    At that moment, Jill's next door neighbor stepped outside to take out her trash.  She heard G.J. screaming and walked over to investigate.  Jill was visibly upset and the neighbor asked Jill what had happened.  Jill recounted that she had fallen with G.J. and wanted to take him to the hospital but could not find her keys.  Jill's neighbor offered to drive and they left in the neighbor's car for the short drive to UCLA-Santa Monica.

44.    Jill's neighbor dropped off Jill and G.J. at the emergency room at approximately 6:30 p.m., and they rushed inside.  Approximately five minutes later, Michael, who had left work immediately after receiving the call, arrived at the emergency room, also distraught.  Michael joined Jill in the emergency room, where they watched G.J. as doctors examined him.  Michael noticed a mark on G.J.'s head

1    and Jill realized that G.J. must have hit his head on the stairs as he fell. G.J. was

2    rushed off for a CT scan to check for internal head injuries.

3      45.    Upon review of the CT scan, doctors discovered that G.J. had a skull

4    fracture and informed Michael and Jill that if the doctors determined that there was

5    any bleeding in G.J.'s brain, G.J. would need to be transferred to UCLA's

6    Westwood Medical Center ("UCLA-Westwood") to see a neurological specialist.

7    Michael and Jill were indescribably upset and concerned for the health of their son.

8      46.    Doctors later diagnosed G.J. with a fracture to the right side of his

9    skull—a parieto-occipital skull fracture with a possible hematoma, or bleeding,

10    underneath the fracture. Doctors reviewed G.J.'s chest x-ray and blood work and

11    did not discover any other injuries. Based upon the possible hematoma, however,

12    doctors determined that G.J. needed to be transferred to UCLA-Westwood to see a

13    neurological expert.

14      47.    Upon information and belief, hospital staff at UCLA-Santa Monica

15    made a routine call to DCFS at 9:04 p.m. to report G.J.'s injuries to DCFS and to

16    inform DCFS that G.J.'s injuries were consistent with Jill's explanation that she had

17    accidentally fallen on the stairs. Upon information and belief, it is UCLA-Santa

18    Monica's standard practice to contact DCFS to report any serious injury to a child,

19    whether the injury has been determined to be accidental or non-accidental.

20      48.    Upon information and belief, DCFS took no action based on UCLA-

21    Santa Monica's report of G.J.'s injuries because DCFS concluded that there were no

22    indications that G.J.'s injuries were non-accidental.

23      49.    At 9:30 p.m. G.J. was transferred by ambulance to UCLA-Westwood.

24    Michael rode in the front seat of the ambulance while Jill planned on driving

25    Michael's car to the hospital, as only one parent was allowed to travel with G.J. As

26    the ambulance was leaving UCLA-Santa Monica, Michael saw that Jill was unable

27    to find his car in the parking lot. He quickly asked the ambulance to stop, jumped

28    out of the ambulance and ran over to Jill, yelling to let her know where his car was

1    parked. Michael returned to the ambulance and they proceeded to UCLA-

2    Westwood.

3        50.    After arriving at UCLA-Westwood, G.J. had a second CT scan at

4    approximately 2:40 a.m. Jill and Michael remained by G.J.'s side and anxiously

5    waited while doctors determined whether G.J. would need to have emergency

6    surgery. At 6:00 a.m., doctors informed Jill and Michael that surgery would not be

7    necessary, and Jill was allowed, for the first time since she had taken G.J. to the

8    hospital, to feed G.J. Because doctors did not yet allow Jill and Michael to hold

9    G.J., Jill fed G.J. expressed breast milk from a bottle.

10       51.    Jill and Michael had not been able to hold G.J. since they arrived at the

11   hospital. Once they were allowed to pick up their son later that morning, each time

12   they held him, they placed a pillow between themselves and G.J. to offer a cushion

13   and to prevent their body from interfering with the wires and tubes connected to G.J.

14   to monitor his vital signs, including the "halo" he wore to monitor for signs of

15   seizures.

16       52.    Later that morning, on February 25, 2010, after making it through a

17   sleepless night and suffering from incredible stress regarding the health of their son,

18   the Joneses were quietly spending time feeding G.J. in his hospital room, thankful

19   that he was on his way to recovery. A UCLA social worker, Eve Beerman, entered

20   their room unannounced and sought to engage the Joneses in conversation. Michael,

21   who was holding G.J. for the first time since the accident, did not respond to

22   Beerman, which, according to a later report written by Beerman, she interpreted as

23   Michael being "rude" to her. Beerman noted this interaction in G.J.'s medical file.

### *G.J. Is Discharged on February 26, 2010, Despite Jill's*
### *Concerns about a Popping Sound in G.J.'s Chest*

26       53.    G.J. remained in the hospital all day Thursday, February 25, 2010 for

27   observation. At approximately 1:00 p.m. on Friday, February 26, 2010 a nurse

28   informed Jill and Michael that G.J. was being discharged and they could take him

1   home. Michael and Jill had concerns about such an early release and called G.J.'s
2   pediatrician to voice such concerns. In addition, when Jill picked G.J. up for the
3   first time without a pillow, she noticed an audible popping sound coming from
4   G.J.'s chest. The nurse confirmed the popping sound but told Jill that her son had
5   been seen by the top doctors in the country, that her son had been discharged and
6   that she should go home.

7        54.    Jill insisted on having a physician examine G.J.'s chest before she took
8   him home. A physician came to examine G.J. and, although he confirmed the
9   existence of the popping sounds after simply touching G.J.'s chest, he concluded
10  that there was no problem with G.J.'s chest and that G.J. was again cleared to be
11  discharged. The doctor did not order a second chest x-ray to confirm that the
12  popping sounds were not rib fractures. These interactions are both noted in G.J.'s
13  medical file.

14       55.    Based upon the nurse's and doctor's assurances that G.J. did not have
15  any undiagnosed injuries, Jill and Michael agreed to take G.J. home. Before leaving
16  the hospital, however, Jill called G.J.'s pediatrician to schedule a check-up
17  appointment for the following Monday morning.

18       56.    Upon information and belief, the popping sounds heard by Jill, the
19  nurse, and the doctor were a result of bilateral posterior lateral rib fractures, which
20  were not detected in the chest x-rays taken of G.J. on February 24, 2010. Upon
21  information and belief, the left-side rib fractures became displaced at some point
22  between the time the chest x-ray was taken of G.J. on February 24, 2010, and when
23  Jill picked up G.J. for the first time without a pillow, on February 26, 2010, and first
24  heard the popping sounds in G.J.'s chest. Upon information and belief, the popping
25  sounds were indicative of a displaced rib fracture in G.J.'s chest. Jill and Michael
26  were unaware at the time, however, of what was causing the popping sound.

27       57.    Over the weekend, Jill and Michael continued to notice the popping
28  sound emanating from G.J.'s chest. In the days after G.J. returned home from the

1    hospital, he required Jill's constant attention and would not sleep without being

2    held. On Monday, March 1, 2010, Jill took G.J. to his appointment with his

3    pediatrician, at which she reported that she continued to hear a popping sound in

4    G.J.'s chest and that G.J. appeared to experience pain when his chest popped. G.J.'s

5    pediatrician examined him and concluded that the popping was not indicative of any

6    injury. He instructed Jill to give G.J. Tylenol regularly. Jill was dissatisfied with

7    the pediatrician's diagnosis, but did not know of anywhere else to turn for better

8    medical advice.

9    ***UCLA-Westwood's SCAN Team Reviews G.J.'s Case and Wang Demands***

10   ***Further Testing to Support Her Unfounded Suspicions that G.J.'s Injuries Were***

11   ***Non-Accidental***

12       58.    Upon information and belief, on Thursday, March 4, 2010, the

13   Suspected Child Abuse and Negligence ("SCAN") team at UCLA-Westwood

14   discussed G.J.'s injuries based upon a referral from a child-life specialist at UCLA-

15   Westwood who noted the severity of G.J.'s injuries but did not note any other basis

16   to indicate that the injuries were non-accidental. Upon information and belief,

17   Defendant Dr. Claudia Wang served as the medical director of the SCAN team and

18   reviewed G.J.'s file following the referral from the child-life specialist.

19       59.    Upon information and belief, following her review of G.J.'s medical

20   records, Wang immediately began to suspect, without a valid factual basis, that

21   G.J.'s injuries were non-accidental. Upon information and belief, Wang recognized

22   that her hypothesis was unsupported by the current evidence, so she concocted a

23   plan to conduct additional, unwarranted medical tests on G.J. in an attempt to

24   confirm her unfounded suspicions.

25       60.    Wang first concluded that she wanted G.J. to undergo additional tests

26   that would potentially confirm that G.J. had been physically abused. Specifically,

27   she wanted G.J. to undergo an ophthalmological exam, which could reveal

28

CALDWELL
LESLIE &
PROCTOR

COMPLAINT

1  symptoms of Shaken Baby Syndrome, as well as a full skeletal x-ray to look for

2  other fractures.

3      61.    Upon information and belief, Wang contacted G.J.'s pediatrician and

4  instructed him to tell Jill to bring G.J. back to UCLA for further testing under the

5  guise that the testing was routine and medically necessary, and not because Wang

6  suspected that G.J. was a victim of child abuse.

7      62.    Upon information and belief, G.J.'s pediatrician thereafter telephoned

8  Jill and told her that G.J. had been released from the hospital "too early" and that,

9  based upon the types of injuries G.J. suffered, the hospital should have conducted a

10 full skeletal exam and an ophthalmological exam.  G.J.'s pediatrician asked Jill to

11 return to UCLA-Westwood the following day, Friday, for the additional, supposedly

12 medically necessary tests.

13     63.    Shortly after Jill received the call from G.J.'s pediatrician, Wang called

14 Jill to repeat the request that Jill bring G.J. to UCLA-Westwood for additional tests.

15 Wang expressly informed Jill that she should not be alarmed about bringing G.J.

16 back to the hospital and assured her that the tests were "routine".  Jill expressed to

17 Wang her hope that the additional tests would provide a satisfactory explanation for

18 the popping sounds she was still hearing in G.J.'s chest.

19             *Jill Brings G.J. to UCLA-Westwood for Additional Tests*

20     64.    Pursuant to Wang's request, Jill arrived at UCLA's Jules Stein Eye

21 Clinic in Westwood at 8:30 a.m. on Friday, March 5, 2010.  G.J. underwent

22 diagnostic testing, including dilation of his pupils, to determine whether he had

23 retinal hemorrhages; the results were negative—no retinal hemorrhages were found.

24 Upon information and belief, the results were communicated to Wang, who was

25 disappointed that her hypothesis was not yet confirmed.  Indeed, upon information

26 and belief, Wang ordered the eye test conducted two more times, without any

27 justification, and with the same result.

28

CALDWELL
LESLIE &
PROCTOR

-14-

COMPLAINT

1    65.    Following the ophthalmological exam, and prior to meeting with Wang,

2  Jill was instructed to take G.J. to the neighboring clinic to have a full skeletal exam,

3  which involves a technician wedging G.J. down between brick-like objects on a

4  table so that the technician may take multiple x-rays of G.J.

5    66.    Following completion of the skeletal x-rays in the early afternoon, Jill

6  was instructed to wait for Wang to interview her.  Jill had been regularly

7  breastfeeding G.J. and was hungry at the time as she had not had anything to eat

8  since arriving at the hospital at 8:00 a.m. that morning.

9    67.    Upon information and belief, radiologists reviewed the skeletal x-rays

10  and diagnosed G.J. with bilateral, symmetrical, lateral posterior fractures on the

11  sixth and seventh ribs, meaning that G.J. had fractures on both sides of his rib cage,

12  toward the sides of the sixth and seventh ribs.  Upon information and belief, the

13  radiologists called Wang and, after reviewing the x-rays together, the radiologists

14  and Wang confirmed the rib fracture diagnosis.  Upon information and belief, Wang

15  and the radiologists knew that because the bilateral fractures were symmetrical, they

16  likely occurred at the same time.  In addition, upon information and belief, Wang

17  was aware that the fractures were consistent with the popping sound Jill and

18  Michael had reported hearing in G.J.'s chest since February 26, 2010.

19    68.    Upon information and belief, Wang also asked one of the radiologists

20  to review the x-ray films taken on February 24, 2010.  The radiologist concluded

21  that while the right rib fractures could have been present on February 24, 2010, the

22  left rib fractures, which were displaced in the x-rays taken on March 5, 2010, and

23  thus more pronounced, were new and not present on February 24, 2010.  Both the

24  radiologist and Wang apparently failed to account for, or intentionally ignored, the

25  symmetrical nature of the fractures, which suggests that the fractures occurred

26  simultaneously and not at different times.  They also failed to account for, or

27  intentionally ignored, the fact that it is common for rib fractures in infants to be

28  present but not discernible on x-rays for a matter of days.

CALDWELL
LESLIE &
PROCTOR

COMPLAINT

69.     At approximately 1:00 p.m., Jill met Wang for the first time when Wang arrived to examine G.J. and interview Jill.  During the interview, Jill's sister, who had arrived to bring Jill lunch, was not permitted into the office where the interview took place.

70.     Wang interviewed Jill for approximately twenty minutes, during which Wang asked Jill to recount the events of February 24, 2010, and describe in detail how she had fallen down the stairs.  Jill explained to Wang that she did not have a clear recollection of how she had fallen or where G.J. had hit the steps.  Jill noted that she had a bruise on her right arm and surmised that she had extended her right arm to catch herself during the fall.  Wang also examined G.J. and later testified that she had felt the popping in G.J.'s chest during that examination.  At no time during her interview did Wang inform Jill that she suspected that G.J. was a victim of child abuse.

71.     After the interview, Wang left the office where the interview took place but instructed Jill to remain at the office until she returned.  Wang was gone for over an hour, during which time Jill and her sister, for the first time, grew suspicious of Wang's motives for examining G.J. and questioning Jill.

### UCLA-Westwood Calls SMPD
### to Report G.J. as a Victim of Child Abuse

72.     Upon information and belief, at approximately 2:00 p.m., Wang, or an individual acting on Wang's instruction, contacted the SMPD to report that G.J. was a victim of child abuse.  This report was made without giving any notification to Jill that she was suspected of abusing G.J.

73.     Shortly thereafter, Defendants and Santa Monica police officers Defendants Russell Grimmond (#3487) and Peter Zamfirov (#3719) were dispatched to UCLA-Westwood, where they first spoke with Wang regarding her allegations.  According to the police report later drafted by Zamfirov, Wang reported that, prior to examining G.J., she suspected G.J. was a victim of child abuse

CALDWELL
LESLIE &
PROCTOR

COMPLAINT

1    because G.J.'s skull fracture was not consistent with the fall described by Jill and

2    also because of Jill's and Michael's interaction with Beerman, following which Jill

3    expressed interest in seeing a family therapist regarding the accident.  According to

4    the police report, because of this suspicion, Wang recalled Jill to UCLA-Westwood

5    for further testing on March 5, 2010, when they discovered the rib fractures.  While

6    Wang conceded that the right-side rib fractures may have been present on February

7    24, 2010, she reported to the police officers that she was "certain the ribs on the left

8    were not fracture [*sic*] during the previous visit to the hospital."

9         74.    Following their conversation with Wang, Grimmond and Zamfirov

10   interviewed Jill for over an hour, during which, according to Zamfirov, Jill was

11   "very cooperative and calm."  Jill answered all of the questions posed to her by the

12   officers.  At no time did the officers inform Jill that she was a suspect in a child

13   abuse investigation or that she had a right to counsel prior to being interviewed.

14        75.    At one point during Jill's interview by Grimmond and Zamfirov, Wang

15   entered the room to challenge Jill's account of how she received a bruise on her arm.

16   Grimmond and Zamfirov permitted Wang to interrogate Jill, under their apparent

17   authority, about her account of the events on February 24, 2010.

18        76.    After learning that Jill was still at the hospital, eight hours after she had

19   arrived, for what Michael believed was a routine check-up for G.J., Michael left

20   work and went to the UCLA-Westwood clinic.  Grimmond and Zamfirov

21   interviewed Michael about Jill's fall.  Michael explained that he was not at home

22   when the accident occurred but, according to Zamfirov's police report, Michael

23   "spoke very highly of [Jill] and said she has never been abusive towards G.J.  I

24   asked him if he thought the incident might have been deliberate.  He said no."

25        77.    Upon information and belief, Grimmond concluded that G.J.'s injuries

26   were consistent with the accident described by Jill and that there were no grounds

27   for arresting Jill for child abuse, nor were there sufficient grounds for officers to

28   take G.J. into protective custody.

CALDWELL
LESLIE &
PROCTOR

-17-

COMPLAINT

*After SMPD Refuses to Detain G.J., UCLA-Westwood Calls*
*DCFS to Report G.J. as a Victim of Child Abuse, and Wang*
*Seeks to Prevent G.J. from Leaving UCLA-Westwood*

78.   At approximately 4:30 p.m., while Grimmond and Zamfirov continued to investigate Wang's allegations, Wang, or, upon information and belief, someone at Wang's direction, made a child abuse report to DCFS. According to a DCFS intake report, the individual reported that the police officers investigating the matter would not be taking G.J. into protective custody.

79.   Upon information and belief, after Wang learned that officers would not take G.J. into protective custody (after finding no legal grounds to do so), Wang devised a plan to keep G.J. at the hospital, under the guise of needing to perform critical medical tests, until a DCFS social worker arrived, whom, upon information and belief, Wang presumed would comply with her unfounded desire to remove G.J. from his parents' custody.

80.   Wang thus ordered G.J. to undergo another CT scan of his head at 4:50 p.m., despite, upon information and belief, there being no medical basis for requesting the additional CT scan. Upon information and belief, Wang falsely suggested to Jill that G.J. may have suffered brain damage in order to induce Jill to agree to further testing for G.J. Jill and her sister raced G.J. to the CT clinic, arriving shortly before it closed. The repeat CT scan did not reveal any additional injuries.

81.   Following the CT scan, upon information and belief, Wang advanced her plan to detain G.J. by instructing Jill that G.J. urgently needed to have additional blood tests performed and that, because all of the clinics were now closed, G.J. would need to be taken to the emergency room at UCLA-Westwood for the tests. Even though Wang represented that the tests needed to be taken immediately so that she could receive the results in a matter of days, upon information and belief, Wang was aware that the results for some, if not all, of the tests ordered, would not be

CALDWELL
LESLIE &
PROCTOR

1 available for weeks and were not urgent. Wang also told Jill she was concerned that

2 G.J. had additional fractures in his legs, even though Wang, upon information and

3 belief, knew that the x-rays had shown that G.J.'s legs were normal physiologically.

4      82.    Upon information and belief, Wang sought to detain G.J. at the hospital

5 over the weekend to have hospital staff closely observe G.J., Jill, and Michael in the

6 hope of gathering further circumstantial evidence that would support Wang's

7 unfounded allegations of child abuse.

8              ***Jill and Michael Are Forced, Under Duress, to Bring G.J.***

9          ***to the UCLA-Westwood Emergency Room for Further Tests***

10     83.    Although Jill and Michael simply wanted to take G.J. home rather than

11 force him to endure further unnecessary tests, Jill and Michael felt they had no

12 option but to comply because (a) the police officers escorted them to the emergency

13 room with Wang's assistant; (b) the officers remained at the office and suggested

14 that Jill and Michael permit additional tests to be conducted on G.J.; and (c) Wang

15 falsely claimed that the blood tests were urgent and medically necessary.

16 Exemplifying the duress suffered by Jill and Michael, Grimmond and Zamfirov,

17 along with Wang's staff, escorted Jill, Michael, and G.J. to the emergency room at

18 approximately 6:30 p.m., nearly twelve hours after G.J. had arrived that morning for

19 "routine tests."

20     84.    Upon information and belief, after escorting G.J. to the emergency

21 room to ensure that he would remain in the hospital's control, despite there being no

22 valid legal or medical basis for his hospitalization, Grimmond and Zamfirov left the

23 hospital and referred the matter to detectives in the SMPD for further investigation.

24     85.    Upon being admitted to the hospital, two nurses attempted

25 unsuccessfully to put an IV into G.J. Jill and Michael demanded to speak with a

26 physician, and Dr. Richelle Cooper arrived in their room. Cooper stated that G.J.

27 did not require an IV but that Wang had ordered he stay in the hospital. When Jill

28 and Michael asked when they could leave, Cooper answered that she would have to

1   check with Wang as only Wang could provide clearance.  The Joneses were then left
2   unattended for hours.

### DCFS Arrives to Conduct an Investigation into Wang's Claims

4       86.    Following Wang's call to DCFS to report her allegation of child abuse,
5   DCFS assigned Defendant Shawn Rivas, a child social worker, to the matter at 7:45
6   p.m., and Rivas arrived at UCLA-Westwood at approximately 9:40 p.m. on March
7   5, 2010.  Upon information and belief, Rivas first interviewed the treating
8   physicians, including Cooper.  Upon information and belief, Cooper told Rivas that
9   it was not necessary for G.J. to be hospitalized and that he could return home and
10  have the requested blood tests completed on the following Monday.

11      87.    Upon information and belief, soon after Rivas's arrival at the hospital,
12  Defendant Susan Land, a UCLA social worker, requested that Rivas issue a hospital
13  hold for G.J., pursuant to California Welfare & Institutions Code § 309(b).  A
14  hospital hold permits DCFS to take a child into temporary custody, and out of the
15  custody of the parents, when certain conditions are met.  In order for a DCFS social
16  worker to issue a hospital hold without the consent of the parents and without a
17  court order, the social worker must, along with his DCFS supervisor, conclude that
18  the child is in imminent danger of serious bodily injury and the child's safety cannot
19  be secured through less intrusive means.  Upon information and belief, Rivas
20  inquired whether G.J.'s injuries were non-accidental, and Land could not provide a
21  definitive answer.  Thus, upon information and belief, Land improperly sought a
22  hospital hold at the direction of Wang, even though Land could not state definitively
23  whether G.J.'s injuries were non-accidental, much less that G.J. was in imminent
24  danger of suffering serious physical harm.

25      88.    Upon information and belief, Rivas sought clarification regarding the
26  hospital's findings from Wang, and Cooper arranged for Rivas to speak with Wang
27  by phone.  Rivas was unable to speak with Wang in person because Wang had left
28  the hospital without informing the Joneses that she was leaving for the weekend, or

CALDWELL
LESLIE &
PROCTOR

COMPLAINT

1 providing any explanation about the tests she had ordered for G.J.  Upon

2 information and belief, Wang refused to state whether G.J.'s injuries were non-

3 accidental or accidental.  Upon information and belief, Rivas inquired as to whether

4 G.J. could be transferred to University of Southern California Hospital for a second

5 opinion, which he hoped would be more definitive.  Upon information and belief,

6 Wang refused this request and insisted that G.J. stay at UCLA, where she would

7 have more control over the investigation into his injuries.  Upon information and

8 belief, despite lacking any legitimate medical reason to have G.J. hospitalized,

9 Wang ordered that G.J. remain at UCLA-Westwood emergency room overnight and

10 then be transferred to the UCLA-Santa Monica the following day.

11      89.    Upon information and belief, although Rivas believed there was no

12 legitimate medical reason for G.J. to remain hospitalized, and despite the fact that no

13 one had definitively concluded that G.J.'s injuries were non-accidental, much less

14 that G.J. was at imminent risk for suffering serious physical harm, Rivas agreed to

15 Wang's plan to keep G.J. hospitalized over the weekend.

16      90.    Rivas interviewed Jill and Michael, who both recounted again the

17 events of February 24, 2010.  Jill and Michael were both under duress during the

18 interview by Rivas due to the fact that G.J. had spent over twelve hours at the

19 hospital, and no one had adequately apprised the Joneses of G.J.'s medical

20 conditions, or the purpose of the investigation by Wang or DCFS.  Moreover, no

21 one expressly told the Joneses that they were the focus of a child-abuse investigation

22 and that they were entitled to the advice of counsel prior to making additional

23 statements.

24      91.    After speaking with the Joneses, Rivas, upon information and belief,

25 spoke with Grimmond and/or Zamfirov, who stated that they found no grounds to

26 detain G.J. based upon the evidence presented.

27      92.    The Joneses waited to receive instructions from Rivas regarding

28 whether they would be allowed to leave the hospital and return home after an

1  arduous day.  Rivas had a duty to independently evaluate the evidence and reach an

2  independent conclusion as to whether there were valid grounds to detain G.J., which

3  there were not.  Absolutely no one, including hospital staff or investigating police

4  officers, had expressly concluded that G.J.'s injuries were non-accidental.  Indeed,

5  upon information and belief, Rivas concluded that there was no basis to remove G.J.

6  from the custody of his parents on March 5, 2010.

7        93.    Rivas, however, abdicated his duties and, instead of informing the

8  Joneses that they were free to leave because there was no basis to detain them at the

9  hospital, Rivas told Jill and Michael that they should follow Wang's instructions or

10  that he would detain G.J. based upon the Joneses' failure to follow medical advice.

11  Thus, although Rivas later testified that Jill and Michael consented to G.J. remaining

12  at the hospital over the weekend, to the extent they did consent, they did so based

13  solely upon Rivas's express threat that he would improperly detain G.J. if the

14  Joneses attempted to leave the hospital.

15        94.    Jill and Michael refused to leave their son alone at the hospital and

16  spent the night at his bedside.  Rivas thus complied with Wang's desire to force G.J.

17  to remain in the hospital, without medical need, until Tuesday, under the guise that

18  the hospital would complete tests that would definitively determine whether G.J.'s

19  injuries were accidental or not.

20              *G.J. Is Transferred to UCLA-Santa Monica and Remains*

21              *Hospitalized Without a Valid Medical Reason*

22        95.    On the morning of March 6, 2010, G.J. was transferred by

23  ambulance—for no reason other than to ensure that G.J. was not in the sole custody

24  of his parents—to UCLA-Santa Monica, where he was admitted ostensibly to have

25  certain tests conducted that would determine whether his injuries were non-

26  accidental, even though, upon information and belief, there was no medical reason

27  for G.J. to be hospitalized.

28

CALDWELL
LESLIE &
PROCTOR

COMPLAINT

96.     Upon information and belief, the hospital arranged for a monitor to observe Jill and Michael at all times in an attempt to develop evidence of strife between Jill and Michael that would support Dr. Wang's false allegations.  In addition, the hospital advised Jill that she was suspected of physically abusing her son, and Jill was not allowed to be alone with G.J.

97.     In addition, UCLA-Santa Monica placed an alarm bracelet around G.J.'s ankle that alerted hospital staff of any attempt to remove G.J. from the hospital, which furthered Jill's and Michael's impression that they were required to keep G.J. hospitalized despite the lack of medical necessity.

98.     The Joneses tried throughout the day on March 6, 2010 to contact Wang and Rivas to receive an explanation as to why they could not take G.J. home. They continued to believe, based upon the false representations made by Wang, that there was a medical reason for G.J. to remain in the hospital, which there was not. Rivas called the hospital room and repeated his instruction that the Joneses should comply with Wang's orders until she completed *her* investigation.  Jill and Michael understood, based upon the representations made by Wang, Rivas, and other hospital staff, that if they attempted to take G.J. from the hospital, they would be viewed as refusing medical treatment and DCFS would remove G.J. from their custody on that basis.

### UCLA-Santa Monica Seeks a Hospital Hold on
### Rivas's Day Off Based on No New Evidence

99.     Upon information and belief, on the following day, March 7, 2010, a social worker at UCLA-Santa Monica called the DCFS hotline and spoke with Defendant Deborah Ramirez, a senior child social worker, to report that the SCAN team had concluded, erroneously, that G.J.'s rib fractures were not present when he was admitted on February 24, 2010, and they therefore suspected G.J. was a victim of child abuse.  The social worker requested that Ramirez issue a hospital hold.

CALDWELL
LESLIE &
PROCTOR

-23-

100.   Upon information and belief, the physician who sought the hospital hold did so at the direction of Wang, despite the fact that the hospital had not received the results of the tests that were purportedly used to determine whether G.J.'s injuries were accidental.  Upon information and belief, Wang directed the social worker to request a hospital hold even though Wang had no additional evidence regarding G.J.'s injuries than she had the prior day when she was unable to conclude whether G.J.'s injuries were accidental.  Upon information and belief, Wang instructed her colleagues to call the DCFS hotline on March 7, 2010, because she knew that Rivas was not working on that day and she believed it would be easier to obtain a hospital hold from a DCFS social worker other than Rivas.

101.   Upon information and belief, even though Rivas, the case worker with the most information concerning G.J.'s injuries, did not believe issuance of a hospital hold was warranted under the facts available at that time, Ramirez, issued a hospital hold without conducting an independent investigation or even consulting with Rivas.  Upon information and belief, Ramirez agreed to issue a hospital hold despite the fact that she failed to establish that G.J. was in imminent danger of serious bodily injury.

102.   Upon information and belief, although Ramirez authorized the hospital hold and filled out the necessary paperwork to issue a hospital hold, Ramirez did not sign her name to the paperwork.  Instead, upon information and belief, Ramirez forged the signatures of Rivas and Rivas's supervisor, Defendant Yolanda Johnson, on the hospital hold form dated March 7, 2010 that authorized the temporary detention of G.J.

103.   Although DCFS issued an improper hospital hold on March 7, 2010, DCFS failed to immediately notify Jill and Michael that G.J. had officially been removed from their custody, which, upon information and belief, violated DCFS's policies.

104.   Upon information and belief, once Rivas learned that a hospital had been issued, he sought to have the hospital hold rescinded based upon a lack of evidence to support the issuance of a hospital hold.  Upon information and belief, Rivas's supervisor, Johnson, refused Rivas's request to rescind the issuance of the unwarranted hospital hold, even though she failed to establish that G.J. was in imminent danger of serious bodily injury.

105.   Upon information and belief, during the course of that weekend, Rivas spoke with hospital staff at UCLA-Santa Monica and determined that the hospital hold had been requested in error.  DCFS, however, failed to rescind the hospital hold and continued to improperly detain G.J.

### Rivas and Johnson Issue a Second Hospital Hold Without Establishing an Imminent Risk of Serious Bodily Harm

106.   Upon information and belief, on the afternoon of Monday, March 8, 2010, Wang contacted Rivas by phone, and Rivas pressed Wang to come to a conclusion regarding G.J.'s injuries.  Upon information and belief, Rivas had grown increasingly frustrated regarding Wang's refusal to definitively state whether G.J.'s injuries were non-accidental or accidental.  Faced with the prospect of G.J. being released to his parents because of the lack of evidence to support her conclusory allegation that G.J. had been abused, Wang abruptly asserted, without relying on any additional information from what she had had on the prior Friday (March 5, 2010) that G.J.'s injuries were "highly suspicious."

107.   Upon information and belief, at the point that Wang proclaimed that G.J.'s injuries were "highly suspicious," Rivas was not presented with any additional evidence concerning the nature of G.J.'s injuries.  Moreover, upon information and belief, Rivas was aware that Wang had considered no additional evidence prior to altering her conclusion to state that G.J.'s injuries were "highly suspicious."  Finally, despite Rivas's numerous requests that Wang reach a definitive conclusion regarding the nature of G.J.'s injuries, Wang refused to do so,

1  because she knew that the evidence did not support such a conclusion.

2  Nevertheless, upon information and belief, Wang agreed to alter her conclusion

3  regarding G.J.'s injuries for the sole purpose of satisfying Rivas's need for a basis to

4  issue a hospital hold.

5      108.   Irrespective of Wang's willingness to modify her medical conclusions

6  regarding alleged child abuse on a whim, Rivas and Johnson completely abdicated

7  their duties by, upon information and belief, relying entirely on Wang's declaration

8  that the injuries were "highly suspicious" as a basis to issue a second hospital hold

9  (Rivas, upon information and belief, falsely believed that the first hospital hold had

10  been rescinded) to temporarily remove G.J. from the custody of his parents. Upon

11  information and belief, neither Rivas nor Johnson had any reasonable basis to

12  believe that G.J. was in imminent risk of serious bodily injury if he were released to

13  the custody of his parents, and neither made any effort to determine if alternative,

14  less intrusive, measures were available rather than completely removing G.J. from

15  his parents' custody.

16      109.   Wang's and DCFS's allegations of child abuse rested entirely on their

17  purported belief that Jill's explanation that the rib fractures occurred during the

18  accidental fall was physically improbable based upon how G.J. reportedly fell down

19  the stairs. Assuming, for a moment, that it was *unlikely* that the rib injuries occurred

20  during the fall, Wang, Land, Ramirez, Rivas, and Johnson failed to consider that

21  every other hypothesis of how the injuries occurred was even more improbable than

22  Jill's explanation. If the rib fractures preceded the fall, the impact of the fall would

23  have displaced the rib fractures and they would have been apparent in the February

24  24, 2010 x-rays. Because the fractures were not apparent in the February 24, 2010

25  x-rays, they must have occurred on or after February 24, 2010. No one disputed

26  that, based upon the popping sound in G.J.'s chest and subsequent reviews of the x-

27  rays, the right-side fractures were present on February 26, 2010. Given that the

28  fractures were bilateral and symmetrical, it was extremely likely they occurred

CALDWELL
LESLIE &
PROCTOR

COMPLAINT

1   simultaneously, thus making the accidental fall on February 24, 2010, the most

2   likely mechanism for the rib fractures.  Because Wang and DCFS were myopically

3   focused on refuting Jill's explanation, Defendants, collectively, overlooked the

4   simple logic that indicated that G.J.'s injuries were accidental.

5       110.   Although the investigation up to that point in time had focused on Jill's

6   care of G.J., Rivas temporarily removed G.J. from the custody of both Jill and

7   Michael because, according to Rivas and DCFS, Michael could not adequately

8   explain how G.J. sustained his injuries.  Upon information and belief, Rivas

9   believed there was no basis to seek the removal of G.J. from the custody of Michael

10   and did so solely at the direction of his supervisors, whom he did not believe had a

11   valid reason for seeking the removal of G.J. from Michael.

12       111.   Upon information and belief, the removal of G.J. from Michael's

13   custody pursuant to the hospital hold, separate and apart from G.J.'s removal from

14   Jill's custody, had absolutely no legal basis.

15                       ***DCFS Conducts a TDM Regarding G.J.'s***

16                       ***Custody, but Violates Its Own Procedures***

17       112.   Rivas scheduled a Team Decision Meeting ("TDM") for the next day,

18   Tuesday, March 9, 2010.  The TDM is a collaborative process used by DCFS to

19   determine a course of action for a detained child.  The TDM regarding G.J. took

20   place, as scheduled, on March 9, 2010, and included Rivas, Johnson, Jill, Michael,

21   some friends and family of the Joneses, and the TDM facilitator.  After a lengthy

22   discussion, in which the participants discussed Wang's allegations and the evidence,

23   *all* of the participants in the TDM agreed that the best course of action was for G.J.

24   to return home with Jill and Michael.

25       113.   Upon information and belief, because the participants in the TDM

26   reached a consensus that G.J. should be returned to the custody of his parents, that

27   plan should have been put into effect without further approval or consultation.

28   Upon information and belief, in violation of DCFS's own policies regarding TDMs,

1   Johnson and the TDM facilitator contacted an unidentified Assistant Regional

2   Administrator for DCFS ("ARA") who summarily rejected the consensus plan of the

3   TDM and required that DCFS continue to detain G.J. in the hospital, despite there

4   being no medical reason for G.J. to remain hospitalized.

5       114.   Upon information and belief, DCFS's social workers and

6   administrators improperly pursued the detention of G.J., due, in part, to negative

7   press DCFS had received around that time criticizing DCFS for failing to protect

8   children in Los Angeles County from abuse, and DCFS did not want to create the

9   impression that it was favoring one of its own employees.

10          ***SMPD Detectives, along with Wang, Conduct a Custodial***

11      ***Interrogation of Jill Without Advising Jill of Her Right to Counsel***

12      115.   On the following day, March 10, 2010, SMPD detectives who had been

13  assigned to the case following Grimmond's and Zamfirov's initial investigation,

14  Defendants Leslie Trapnell and Lloyd Gladden, arrived at the hospital to gather

15  additional information about the case.

16      116.   According to their police report, Trapnell and Gladden first spoke with

17  Wang.  Upon information and belief, in an attempt to have criminal charges pressed

18  against Jill and Michael, Wang deliberately misled detectives regarding the nature of

19  G.J.'s injuries.  While the radiologists and Wang had previously concluded that

20  G.J.'s skull injury, although it involved two bones, occurred as a result of the

21  accidental fall, Wang asserted to the detectives, for the first time, that the "two

22  fractures do not appear related and occurred at two different times or at two different

23  hits to the head."  Upon information and belief, Wang knew this statement was

24  false, and she made it in a desperate attempt to secure baseless criminal charges

25  against Jill and Michael.

26      117.   Trapnell and Gladden next sought to interview Jill about the accident.

27  Trapnell and Gladden informed Jill that they wished to interview her about the

28  accident and suggested that if she did not cooperate with their investigation, it would

1  be detrimental to her efforts to recover custody of G.J.  Especially in light of the fact

2  that a hospital hold had been issued and G.J. had been removed from her custody,

3  Jill believed that she was compelled to answer the questions posed by the detectives.

4       118.   Jill's interrogation, which occurred in a room with the detectives and

5  Wang, lasted for approximately an hour and a half.  At no time during the interview

6  did Trapnell or Gladden inform Jill that she had the right to counsel during the

7  interview.

8       119.   Rather than conduct an independent investigation in an effort to

9  evaluate the facts of the case objectively, Trapnell and Gladden permitted Wang—

10  Jill's and Michael's chief accuser—into the interview room and, moreover,

11  permitted Wang to ask the majority of the questions to Jill, including accusatory

12  questions that indicated that Jill was the target of the investigation and further

13  confirmed Jill's belief that she was not permitted to leave the interrogation.

14       120.   Trapnell and Gladden abdicated their duties and violated Jill's rights by

15  permitting Wang, under their authority, to question Jill about the accident.  Any

16  testimony obtained during the interview by Trapnell, Gladden, and Wang was

17  obtained under duress.

18       ***Following the Hearing Concerning G.J.'s Temporary Detention,***

19       ***the Commissioner Ordered G.J. Released to His Parents***

20       121.   A Detention Hearing for G.J. was held on March 11, 2010, before the

21  Honorable Jacqueline H. Lewis.  Upon information and belief, Commissioner Lewis

22  found DCFS's initial Detention Hearing Report to be inadequate and continued the

23  Detention Hearing to the following day to permit DCFS to submit additional

24  evidence in support of its allegation that G.J.'s injuries were non-accidental and that

25  G.J. should be temporarily removed from the custody of both of his parents pending

26  the trial.  Although she continued the hearing to permit DCFS to submit additional

27  evidence, Commissioner Lewis ordered that G.J.'s continued detention was not in

28  his best interest and ordered G.J. detained to the home of Jill's parents pending

1  completion of the hearing, rather than to the hospital.  Commissioner Lewis also

2  permitted Jill and Michael to have monitored visits with G.J.

3     122.  During the Detention Hearing, Defendant Amir Pichvai, who, on behalf

4  of County Counsel, represented DCFS in the proceeding, advanced a new theory of

5  why G.J.'s injuries were non-accidental.  Upon information and belief, Pichvai

6  recognized that Wang's position that the left-side rib fractures were new while the

7  right-side rib fractures existed as of February 24, 2010, was implausible.  Instead,

8  Pichvai represented to the court that *all* of G.J.'s rib fractures were present when

9  G.J. was first admitted into UCLA-Santa Monica on February 24, 2010.  Pichvai

10  failed to recognize that his theory supported the Joneses' assertion that G.J.'s

11  injuries were accidental.  All parties agreed that if the fractures occurred during the

12  fall, they would be accidental in nature and would not support G.J.'s detention.  If

13  the rib fractures occurred before the accidental fall, the impact of the fall would

14  likely have displaced the fractures, and the rib fractures would have been readily

15  apparent in the x-ray taken on February 24, 2010.  Thus, because the fractures were

16  not apparent in the chest x-ray taken on February 24, 2010, the rib fractures,

17  according to Pichvai's own theory, were the result of the accident, and did not

18  justify G.J.'s detention.

19     123.  After considering the evidence presented by DCFS and hearing Jill's

20  testimony during the Detention Hearing, Commissioner Lewis concluded that DCFS

21  had failed to establish a *prima facie* case of child abuse and therefore ordered that

22  G.J. be returned to the custody of his parents pending the trial on DCFS's

23  allegations.

24     124.  DCFS then requested that Commissioner Lewis stay her order pending

25  DCFS's appeal of her order.  Commissioner Lewis noted that, while she has stayed

26  her orders pending appellate court review in the past, she would not do so here and

27  ordered that G.J. be released immediately to his parents pending trial.

28

CALDWELL
LESLIE &
PROCTOR

-30-

125.   Despite the fact that Wang and other physicians ordered tests and other medical procedures performed on G.J. without the Joneses' consent even though they were in no way medically necessary, the Joneses have received medical bills from UCLA-Santa Monica and UCLA-Westwood totaling approximately $21,945 related to G.J.'s hospitalization between March 5 and 11, 2010.

### *County Counsel Seeks a Writ of Mandate and*
### *Misrepresents the Record to the Court of Appeal*

126.   Unsatisfied with the prospect of G.J. returning to his parents, County Counsel filed a Petition for Writ of Mandamus and Request for Immediate Stay on March 15, 2010 (the "Writ Petition").   In the Writ Petition, Pichvai falsely asserted that "[t]here was uncontroverted medical evidence before the court that the mechanism of the reported fall was not consistent with G.J.'s injuries—that is, G.J. could not have suffered his skull fracture and symmetrical rib fractures on both sides from the same fall."   Pichvai was well aware that Wang merely testified that the rib injuries were "highly suspicious" and that the rib injuries "were not easily explained" by the fall.   This uncertainty regarding the cause of the rib injuries does not reflect "uncontroverted evidence" that G.J.'s injuries were non-accidental.

127.   Based, presumably in part, on the false assertions made by Pichvai in the Writ Petition, the same day it was filed and before Jill, Michael, and G.J. could submit an opposition, the Court of Appeal granted the Writ Petition and ordered G.J. to be detained with his maternal grandparents pending the trial, which began on April 15, 2010.   During the detention, Jill and Michael were permitted monitored visits to G.J. at his grandparent's house, but they were not permitted to stay overnight.

128.   Because of the forced separation between Jill and G.J., Jill was unable to maintain her milk production, and she soon lost the ability to breastfeed G.J., despite the fact that G.J. was less than four months old.   This loss of her ability to breastfeed her son at such a young age was emotionally traumatic for Jill and G.J.

*Following the Full Trial, Commissioner Lewis Lambasts Wang*
*and Orders G.J. Released to His Parents Immediately*

129.   While the trial began on April 15, 2010, the Court's schedule did not permit the trial to continue on consecutive days, and the Court heard evidence over six days, ending on May 3, 2010.   During these months, Michael was forced to take a leave of absence from work.   Jill was on unpaid maternity leave, and had to ask for additional time off through the duration of the trial.   In addition, Jill and Michael suffered, on a daily basis, the humiliation of facing friends and family members who were aware that Jill and Michael were accused of abusing their son.

130.   The stress of being falsely accused of child abuse manifested itself in severe emotional distress and other psychological injuries.

131.   During the trial, Wang again revised her theory of G.J.'s injuries. Rather than definitively state that the left-side rib fractures occurred after February 24, 2010, as she had alleged in her medical report submitted at the Detention Hearing, Wang, in response to the question, "Is it your opinion that the rib fractures were sustained at the same time or not?" answered, "That is difficult to say.   I'm not sure."   In fact, Wang testified that Jill's reporting of popping sounds in G.J.'s chest "made me assume that on February 24th one or all rib fractures could have been there."   Wang also no longer asserted that the skull fractures occurred at different times or were not the result of the accidental fall.   Wang's sworn testimony at trial thus flatly contradicts her summary conclusions that formed the basis for detaining G.J. in March 2010.   While the intervening time before trial may have provided Wang with time to reflect on her medical conclusions and recognize that they were nonsensical, the damage of her crusade to force the unwarranted separation of G.J. from his parents had already been done.

132.   The Court heard testimony from the Joneses' medical expert, who offered the only plausible explanation for G.J.'s rib fractures.   Contrary to Wang's summary conclusion that the rib fractures could not have occurred as part of the

1   accidental fall, Dr. Thomas Grogan, an esteemed pediatric orthopedic surgeon,

2   surmised, based upon his review of G.J.'s medical records, that Jill had reflexively

3   squeezed G.J. between her left arm and chest as she fell and that this caused the rib

4   fractures before G.J. fell out of her arm and hit his head on the stair below.

5       133.   At the conclusion of the trial, Commissioner Lewis found the evidence

6   "overwhelming" that a "horrific accident" had taken place.  Commissioner Lewis, in

7   exonerating Jill and Michael, stated, "[T]his is the first time in 20 years I've seen . . .

8   [that] the parents' story has remained consistent and the doctor's stories have

9   changed over and over and over again to try to unmatch the parents' story."  She

10  stated further that the proceedings were "a credibility call for Wang.  The stories of

11  the injuries and what they were, and how they occurred changed so many times

12  from the date of the original detention hearing to the next day; from that date to

13  reports she made; to her testimony, even on the witness stand."

14      134.   This travesty of justice resulted in the deprivation of the rights of Jill,

15  Michael, and G.J. to be together as a family at home for more than two months.  The

16  disruption and distress this caused for all three of them was overwhelming and

17  continues to have lasting effects to this day.

18                          **FIRST CAUSE OF ACTION**

19  **(False Imprisonment by G.J. Against Claudia Wang and Susan Land, in Their**

20  **Individual Capacities, Shawn Rivas, Deborah Ramirez, Yolanda Johnson,**

21  **Russell Grimmond, and Peter Zamfirov, in Their Individual and Official**

22  **Capacities, Los Angeles County Department of Children and Family Services,**

23  **County of Los Angeles, City of Santa Monica Police Department, City of Santa**

24                      **Monica, and DOES 1-20)**

25      135.   Plaintiffs re-allege and incorporate by reference each and every

26  allegation contained in paragraphs 1 through 134, inclusive.

27      136.   G.J. was unlawfully detained, without the free and voluntary consent of

28  either G.J. or his parents, and without legal privilege, on the following occasions:

CALDWELL
LESLIE &
PROCTOR

COMPLAINT

1        a.     On March 5, 2010, Wang informed G.J.'s parents that G.J. was

2 required to be admitted to UCLA-Westwood hospital, even though there was no

3 medical necessity for G.J. to be hospitalized and G.J.'s parents were under no legal

4 obligation to admit G.J. to the hospital.  Wang, Grimmond, and Zamfirov stated that

5 if G.J.'s parents did not agree to admit him into the hospital, then G.J. would likely

6 be removed from their custody based upon their refusal to agree to unnecessary

7 medical treatment.  G.J.'s parents thus consented under duress and not of their free

8 will to G.J. being admitted to UCLA-Westwood hospital.  Grimmond and Zamfirov

9 escorted G.J. and his parents to the UCLA-Westwood emergency room, which

10 furthered G.J.'s parents' belief that they had no choice but to comply with Wang's

11 demand for hospitalization.

12        b.    From March 5, 2010 through March 11, 2010, Wang, Land,

13 Ramirez, Rivas, and Johnson conspired to improperly detain G.J. at UCLA-

14 Westwood and UCLA-Santa Monica by informing G.J.'s parents that if they did not

15 comply with Wang's orders to keep G.J. hospitalized, G.J. would be removed from

16 their custody for their refusal of medical treatment.  Upon information and belief,

17 Wang, Land, Ramirez, Rivas, and Johnson each knew that there were no valid legal

18 or medical grounds to require G.J. to be hospitalized, and their threats to G.J.'s

19 parents were intended to keep G.J. improperly detained.

20        c.     Upon information and belief, on March 7, 2010, Ramirez, as an

21 agent of DCFS, improperly issued a hospital hold, thereby detaining G.J., despite

22 the fact that there were no exigent circumstances that justified G.J.'s temporary

23 detention.  Upon information and belief, Ramirez knew that the requirements for a

24 hospital hold were not satisfied and/or recklessly disregarded the legal requirements

25 for issuing a hospital hold.  Moreover, upon information and belief, Ramirez forged

26 the signatures on the hospital hold she issued.

27        d.    On March 8, 2010, Rivas and Johnson, as agents for DCFS,

28 improperly issued a hospital hold, thereby detaining G.J., despite the fact that there

1   were no exigent circumstances that justified G.J.'s temporary detention.  Upon

2   information and belief, Rivas and Johnson knew that the requirements for a hospital

3   hold were not satisfied and/or recklessly disregarded the legal requirements for

4   issuing a hospital hold.

5        e.      On March 9, 2010, the unidentified ARA, as an agent of DCFS,

6   improperly rejected the consensus recommendation of the TDM to permit G.J. to

7   return home with his parents.  Instead, the ARA improperly required G.J. to remain

8   detained pending the Detention Hearing.

9        f.      In his Application for a Writ, Pichvai failed to disclose

10   exculpatory evidence to the Court of Appeal by asserting that "[t]here was

11   uncontroverted medical evidence before the court that the mechanism of the

12   reported fall was not consistent with G.J.'s injuries—that is, G.J. could not have

13   suffered his skull fracture and symmetrical rib fractures on both sides from the same

14   fall." In addition, Pichvai submitted as evidence the hospital hold issued, upon

15   information and belief, by Ramirez, which Pichvai, upon information and belief,

16   knew or should have known was forged.

17        137.   Upon information and belief, Ramirez, Rivas, Johnson, and the ARA,

18   in concluding that there were valid grounds for the temporary detention of G.J.

19   identified in Paragraph 136, failed to exercise due care in performing their

20   ministerial duties to investigate claims of child abuse.

21        138.   The County of Los Angeles is vicariously liable for the conduct of the

22   employees Ramirez, Rivas, and Johnson under California Government Code

23   § 815.2.

24        139.   As a direct result of each of the incidents listed in Paragraph 136, G.J.

25   was physically and emotionally injured.

26        140.   Wang, Land, Thomas, Ramirez, Rivas, Johnson, and the ARA acted

27   with malice with the intent to cause injury to G.J. and/or acted with a willful and

28   conscious disregard of G.J.'s rights in a despicable manner.  In addition, upon

CALDWELL
LESLIE &
PROCTOR

-35-

1  information and belief, Ramirez acted fraudulently in forging the signatures of Rivas
2  and Johnson on the hospital hold issued on March 7, 2010, and suggesting that
3  Rivas and Johnson approved the hospital hold, which, upon information and belief,
4  they did not.

5  **SECOND CAUSE OF ACTION**

6  **(Intentional Infliction of Emotional Distress by All Plaintiffs Against**
7  **Claudia Wang, and Susan Land, in their Individual Capacities, Shawn Rivas,**
8  **Deborah Ramirez, Yolanda Johnson, Russell Grimmond, and Peter Zamfirov,**
9  **and Amir Pichvai, in their Individual and Official capacities, Los Angeles**
10 **County Department of Children and Family Services, the Office of County**
11 **Counsel for Los Angeles County, County of Los Angeles, City of Santa Monica**
12 **Police Department, City of Santa Monica, and DOES 1-20)**

13      141.  Plaintiffs re-allege and incorporate by reference each and every
14 allegation contained in paragraphs 1 through 140, inclusive.

15      142.  Plaintiffs each suffered extreme emotional distress as a result of
16 outrageous conduct by Defendants named in this cause of action.  Defendants'
17 outrageous conduct included, but was not limited to:

18           a.     Wang misrepresenting the purpose of Wang's re-examination of
19 G.J. after he had been initially discharged from the hospital;

20           b.     Grimmond and Zamfirov acting in a manner that suggested Jill
21 was required by law to follow Wang's order and take G.J. to the emergency room
22 when there was no legal or medical reason for G.J. to be hospitalized;

23           c.     Defendants' repeated efforts to remove G.J. from the custody of
24 his parents without legal justification;

25           d.     Defendants' repeated threats that if Jill and Michael did not
26 comply with Wang's hospitalization orders, G.J. would be removed from their
27 custody for refusal to follow medical advice;

28

CALDWELL
LESLIE &
PROCTOR

COMPLAINT

1       e. Defendants' decision to seek G.J.'s removal from Michael's

2    custody, despite having absolutely no evidence of physical abuse of any kind by

3    Michael, and having no evidence that G.J. was in imminent danger of serious bodily

4    injury from Michael; and

5       f. Pichvai's and County Counsel's failure to disclose exculpatory

6    evidence to Commissioner Lewis and the Court of Appeal, his reliance on

7    fraudulent documents, and his deliberate assertion of contradictory explanations of

8    G.J.'s injuries to support his claim of child abuse.

9      143. Defendants acted with the intention of causing or reckless disregard of

10   the probability of causing emotional distress to Plaintiffs.

11     144. Plaintiffs suffered severe and/or extreme emotional distress as a result

12   of the invalid removal of G.J. from the custody of his parents, the actual and

13   proximate cause of which was Defendants' outrageous conduct.

14           **THIRD CAUSE OF ACTION**

15   **(Negligence By All Plaintiffs Against Claudia Wang, and Susan Land, in Their**

16   **Individual capacities, Shawn Rivas, Deborah Ramirez, Yolanda Johnson,**

17   **Russell Grimmond, Peter Zamfirov, and Amir Pichvai, in Their Individual and**

18   **Official Capacities, Los Angeles County Department of Children and Family**

19   **Services, the Office of the County Counsel for Los Angeles County, County of**

20   **Los Angeles, City of Santa Monica Police Department, City of Santa Monica,**

21   **and DOES 1-20)**

22     145. Plaintiffs re-allege and incorporate by reference each and every

23   allegation contained in paragraphs 1 through 144, inclusive.

24     146. Defendants named in this cause of action each had a duty not to seek

25   the detention, either expressly or impliedly, of G.J. without legal justification. Each

26   of the Defendants named in this cause breached their duty by seeking or assisting in

27   the detention of G.J. The Defendants' breaches include, but are not limited to:

28

CALDWELL
LESLIE &
PROCTOR

COMPLAINT

1      a.      Grimmond and Zamfirov acting in a manner that suggested Jill

2  was required by law to follow Wang's order and take G.J. to the emergency room

3  when there was no legal or medical reason for G.J. to be hospitalized;

4      b.      Defendants' repeated efforts to remove G.J. from the custody of

5  his parents without legal justification;

6      c.      Defendants' repeated threats that if Jill and Michael did not

7  comply with Wang's hospitalization orders, G.J. would be removed from their

8  custody for refusal to follow medical advice;

9      d.      Defendant's decision to seek G.J.'s removal from Michael's

10 custody, despite having absolutely no evidence of physical abuse of any kind by

11 Michael, and having no evidence that G.J. was in imminent danger of serious bodily

12 injury from Michael; and

13     e.      Pichvai's and County Counsel's failure to disclose exculpatory

14 evidence to Commissioner Lewis and the Court of Appeal, his reliance on

15 fraudulent documents, and his deliberate assertion of contradictory explanations of

16 G.J.'s injuries to support his claim of child abuse.

17     147.   Defendants' breaches of their duties owed to Plaintiffs each resulted in

18 severe emotional injuries for which Plaintiffs each seek damages.

19     148.   The extreme emotional injuries suffered by Plaintiffs were foreseeable

20 by Defendants at the time of each of their breaches.

21                          **FOURTH CAUSE OF ACTION**

22     **(Deceit by Michael Jones and Jill Jones against Claudia Wang, in her**

23                 **Individual Capacity, and DOES 1-20)**

24     149.   Plaintiffs re-allege and incorporate by reference each and every

25 allegation contained in paragraphs 1 through 148, inclusive.

26     150.   Wang made knowing misrepresentations of facts to Jill and/or Michael

27 concerning the health and treatment of their minor son, G.J., including, but not

28 limited to:

CALDWELL
LESLIE &
PROCTOR

-38-

1          a.    Misrepresenting on March 4, 2010 that G.J. needed to be brought

2   back to UCLA-Westwood because he was discharged prematurely and that further

3   routine tests needed to be conducted;

4          b.    Misrepresenting on March 4, 2010 that Jill should not have any

5   concerns regarding the additional tests ordered for G.J. and that the tests were

6   "routine";

7          c.    Misrepresenting on March 5, 2010 the purpose of the tests

8   conducted on G.J. and their medical necessity;

9          d.    Misrepresenting on March 5, 2010 that G.J. had possible

10  additional fractures in his leg bones;

11         e.    Misrepresenting on March 5, 2010 that G.J. required urgent

12  blood tests that required him to go to the emergency room;

13         f.    Misrepresenting on March 5, 2010 that the results of blood tests

14  taken at the emergency room would be available in a matter of days when, upon

15  information and belief, the results would not be available for a matter of months.

16      151.  With respect to each of these misrepresentations, Wang knew of the

17  statement's falsity.  In addition, Wang concealed from both Jill and Michael the fact

18  that G.J. was a suspected victim of child abuse.  To the extent Wang believed she

19  did not have a duty to disclose this material information to Jill, as Jill was suspected,

20  without reason, of deliberately causing G.J.'s injuries, Wang continued to have a

21  duty to provide Michael with relevant information concerning G.J.'s medical care.

22      152.  The purpose of the misrepresentations was to induce Jill to bring G.J. to

23  UCLA-Westwood on March 5, 2010, and to keep G.J. at UCLA-Westwood and

24  UCLA-Santa Monica until March 11, 2010.

25      153.  Jill and Michael justifiably relied on the misrepresentations made by

26  the physician treating G.J.

27      154.  If not for the misrepresentations made by Wang, Jill would not have

28  taken G.J. to UCLA-Westwood for further testing on March 5, 2010, and Wang

1    would not have discovered the rib fractures that formed the basis of G.J.'s

2    temporary detention.  Furthermore, if Wang had not misrepresented the purpose of

3    the medical procedures and tests performed on G.J. between March 5 and 11, 2010,

4    Michael and Jill would have not taken G.J. to the emergency room, and a hospital

5    hold would not have been placed on G.J.

6         155.   Wang's deceit resulted in damages to be proven at trial.

7                        **FIFTH CAUSE OF ACTION**

8    **(Section 1983 (Fourth Amendment Right to Be Free from Unreasonable Search**

9    **and Seizure) by G.J. against Claudia Wang, and Susan Land, in their**

10   **Individual capacities, Shawn Rivas, Deborah Ramirez, Yolanda Johnson, the**

11   **Assistant Regional Administrator for the Los Angeles County Department of**

12   **Children and Family Services, Russell Grimmond, and Peter Zamfirov, in their**

13   **Individual and Official Capacities, and DOES 1-20)**

14        156.   Plaintiffs re-allege and incorporate by reference each and every

15   allegation contained in paragraphs 1 through 155, inclusive.

16        157.   G.J. was unlawfully detained under the color of state law, without legal

17   authority, in violation of his Fourth Amendment right against unreasonable search

18   and seizure, on the following occasions:

19             a.     On March 5, 2010, Grimmond, and Zamfirov stated that G.J.'s

20   parents must admit him into the hospital.  G.J.'s parents thus consented under duress

21   and not of their free will to G.J. being admitted to UCLA-Westwood hospital.

22   Grimmond and Zamfirov escorted G.J. and his parents to the UCLA-Westwood

23   emergency room, which furthered G.J.'s parents' belief that they had no choice but

24   to comply with Wang's demand for hospitalization.

25             b.     From March 5, 2010 through March 11, 2010, Wang, Land,

26   Thomas, and Rivas conspired to improperly detain G.J. at UCLA-Westwood and

27   UCLA-Santa Monica by informing G.J.'s parents that if they did not comply with

28   Wang's orders to keep G.J. hospitalized, G.J. would be removed from their custody

CALDWELL
LESLIE &
PROCTOR

1  for their refusal of medical treatment.  Upon information and belief, Wang, Land,
2  Thomas, and Rivas each knew that there were no valid legal or medical grounds to
3  require G.J. to be hospitalized, and their threats to G.J.'s parents were intended to
4  keep G.J. improperly detained.

5        c.     Upon information and belief, on March 7, 2010, Ramirez, as an
6  agent of DCFS, improperly issued a hospital hold, thereby detaining G.J., despite
7  the fact that there were no exigent circumstances that justified G.J.'s temporary
8  detention.  Upon information and belief, Ramirez knew that the requirements for a
9  hospital hold were not satisfied and/or recklessly disregarded the legal requirements
10  for issuing a hospital hold.  Moreover, upon information and belief, Ramirez forged
11  the signatures on the hospital hold she issued.

12        d.     On March 8, 2010, Rivas and Johnson, as agents for DCFS,
13  improperly issued a hospital hold, thereby detaining G.J., despite the fact that there
14  were no exigent circumstances that justified G.J.'s temporary detention.  Upon
15  information and belief, Rivas and Johnson knew that the requirements for a hospital
16  hold were not satisfied and/or recklessly disregarded the legal requirements for
17  issuing a hospital hold.

18        e.     On March 9, 2010, the unidentified ARA, as an agent of DCFS,
19  improperly rejected the consensus recommendation of the TDM to permit G.J. to
20  return home with his parents.  Instead, the ARA improperly required G.J. to remain
21  detained pending the Detention Hearing.

22        f.     In his Application for Writ, Pichvai failed to disclose exculpatory
23  evidence to the Court of Appeal by asserting that "[t]here was uncontroverted
24  medical evidence before the court that the mechanism of the reported fall was not
25  consistent with G.J.'s injuries—that is, G.J. could not have suffered his skull
26  fracture and symmetrical rib fractures on both sides from the same fall."  In
27  addition, Pichvai submitted as evidence the hospital hold issued, upon information

28

CALDWELL
LESLIE &
PROCTOR

COMPLAINT

1  and belief, by Ramirez, which Pichvai, upon information and belief, knew or should

2  have known was forged.

3      158.   Each of the Defendants named in this cause of action knew or should

4  have known that the improper detention of G.J. and his removal from his parents'

5  custody violated G.J.'s clearly established constitutional right to be free from

6  unreasonable seizure.  In addition, the Defendants' efforts to detain G.J. did not

7  reflect a good faith exercise of Defendants' official responsibilities.

8      159.   As a direct result of each of the incidents listed in Paragraph 157, G.J.

9  was physically and emotionally injured.

10     160.   Wang, Land, Thomas, Ramirez, Rivas, Johnson, and the ARA acted

11 with malice with the intent to cause the unreasonable detention of G.J. and/or acted

12 with a willful and conscious disregard of G.J.'s rights in a despicable manner.  In

13 addition, upon information and belief, Ramirez acted fraudulently in forging the

14 signatures of Rivas and Johnson on the hospital hold issued on March 7, 2010, and

15 suggesting that Rivas and Johnson approved the hospital hold, which, upon

16 information and belief, they did not.

17                          **SIXTH CAUSE OF ACTION**

18     **(Section 1983 (Violation of Substantive Due Process Rights to Familial**

19      **Association and to Be Free from Outrageous and Egregious Conduct**

20      **Constituting Abuse of Power) by Plaintiffs against Claudia Wang and**

21   **Susan Land, in their Individual Capacities, Shawn Rivas, Deborah Ramirez,**

22  **Yolanda Johnson, Russell Grimmond, and Peter Zamfirov, in their Individual**

23             **and Official capacities, and DOES 1-20)**

24     161.   Plaintiffs re-allege and incorporate by reference each and every

25 allegation contained in paragraphs 1 through 160, inclusive.

26     162.   Plaintiffs have a substantive due process right under the Fourteenth

27 Amendment to the United States Constitution to be free from outrageous and

28 egregious conduct constituting an abuse of government authority.  In addition, Jill

CALDWELL
LESLIE &
PROCTOR

-42-

1  and Michael have a substantive due process right to care for and have custody of

2  G.J. Defendants named in this cause of action violated Plaintiffs' substantive due

3  process rights by engaging in conduct including, but not limited to, the following:

4          a.     Wang misrepresenting the purpose of Wang's re-examination of

5  G.J. after he had been initially discharged from the hospital;

6          b.     Grimmond and Zamfirov acting in a manner that suggested Jill

7  was required by law to follow Wang's order and take G.J. to the emergency room

8  when there was no legal or medical reason for G.J. to be hospitalized;

9          c.     Defendants' repeated efforts to remove G.J. from the custody of

10  his parents without legal justification;

11          d.     Defendants' repeated threats that if Jill and Michael did not

12  comply with Wang's hospitalization orders, G.J. would be removed from their

13  custody for refusal to follow medical advice;

14          e.     Defendants' decision to seek G.J.'s removal from Michael's

15  custody, despite having absolutely no evidence of physical abuse of any kind by

16  Michael, and having no evidence that G.J. was in imminent danger of serious bodily

17  injury from Michael; and

18          f.     Pichvai's and County Counsel's failure to disclose exculpatory

19  evidence to Commissioner Lewis and the Court of Appeal, his reliance on

20  fraudulent documents, and his deliberate assertion of contradictory explanations of

21  G.J.'s injuries to support his claim of child abuse.

22      163.   Each of the Defendants named in this cause of action knew or should

23  have known that the improper attempts to remove G.J. from his parents' care and

24  custody violated Plaintiffs' clearly established constitutional right to be free from

25  outrageous and egregious conduct reflecting abuse of governmental authority and

26  Jill's and Michael's clearly established constitutional right to care for and have

27  custody of their son. In addition, the Defendants' efforts to detain G.J. did not

28  reflect a good faith exercise of Defendants' official responsibilities.

164.   As a direct result of each of the incidents listed in Paragraph 162, Plaintiffs were each injured.

165.   Wang, Land, Thomas, Ramirez, Rivas, Johnson, and the ARA acted with malice with the intent to cause the unreasonable detention of G.J. and/or acted with a willful and conscious disregard of G.J.'s rights in a despicable manner.  In addition, upon information and belief, Ramirez acted fraudulently in forging the signatures of Rivas and Johnson on the hospital hold issued on March 7, 2010 and suggesting that Rivas and Johnson approved the hospital hold, which, upon information and belief, they did not.

## SEVENTH CAUSE OF ACTION

**(Violation of Right to Be Free from Coercive Interrogation under United States Constitution by Jill Jones against Leslie Trapnell, and Lloyd Gladden, in their Individual and Official Capacities, and DOES 1-20)**

166.   Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 165, inclusive.

167.   Gladden and Trapnell violated Jill's rights under the Fourth and Fifth Amendments to the United States Constitution by subjecting her to a custodial interrogation without informing her of her right to counsel.

168.   Jill was questioned by Gladden and Trapnell on March 10, 2010, in a room at UCLA-Santa Monica.  Upon information and belief, Gladden and Trapnell knew that Jill had been staying with G.J. since his hospitalization on March 5, 2010, and was under significant duress due to the investigation into G.J.'s injuries.  Upon information and belief, Gladden and Trapnell also knew that a hospital hold had been issued on or before March 8, 2010, which removed G.J. from the custody of his parents based upon the assertion that G.J. would be in imminent danger of serious bodily injury if he was permitted to return home with his parents.

169.   At the time Gladden and Trapnell informed Jill that they would like to interview her, Jill reasonably believed that she was a suspect in a child abuse investigation and was required to answer the detectives' questions.

170.   Gladden and Trapnell conducted their interrogation in a small room and permitted Wang, Jill's chief accuser, to remain in the room. Moreover, Gladden and Trapnell, upon information or belief, expressly or implicitly allowed Wang to ask confrontational questions to Jill throughout the interrogation, causing Jill to suffer additional duress.

171.   Jill reasonably believed that the only way to have the hospital hold released immediately was to participate in the interrogation, albeit it under extreme duress.

172.   At no time during the interrogation did Gladden or Trapnell ever indicate that Jill was free to leave the room or not participate in the interrogation.

173.   At no time before, during, or after the interrogation did Gladden or Trapnell inform Jill of her *Miranda* rights.

174.   Each of the Defendants named in this cause of action knew or should have known that the custodial interrogation of Jill, under duress, violated Jill's clearly established constitutional right to be free from unreasonable seizure and coercive interrogations. In addition, the Defendants' coercive interrogation of Jill did not reflect a good faith exercise of Defendants' official responsibilities.

175.   Jill was emotionally injured as a result of her coercive interrogation.

176.   Gladden and Trapnell acted with malice with the intent to cause the coercive interrogation of Jill and/or acted with a willful and conscious disregard of Jill's rights in a despicable manner.

## EIGHTH CAUSE OF ACTION

**(Violation of Right to Be Free from Coercive Interrogation Under California Constitution by Jill Jones against Leslie Trapnell and Lloyd Gladden, in their Individual and Official capacities, and DOES 1-20)**

177.   Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 176, inclusive.

178.   Gladden and Trapnell violated Jill's Rights under Article I, §§ 1, 13 and 28(d), of the California Constitution by subjecting her to a custodial interrogation without informing her of her right to counsel.

179.   Jill was questioned by Gladden and Trapnell on March 10, 2010, in a room at UCLA-Santa Monica.  Upon information and belief, Gladden and Trapnell knew that Jill had been staying with G.J. since his hospitalization on March 5, 2010, and was under significant duress due to the investigation into G.J.'s injuries.  Upon information and belief, Gladden and Trapnell also knew that a hospital hold had been issued on or before March 8, 2010, which removed G.J. from the custody of his parents based upon the assertion that G.J. would be in imminent danger of serious bodily injury if he was permitted to return home with his parents.

180.   At the time Gladden and Trapnell informed Jill that they would like to interview her, Jill reasonably believed that she was a suspect in a child abuse investigation and was required to answer the detectives' questions.

181.   Gladden and Trapnell conducted their interrogation in a small room and permitted Wang, Jill's chief accuser, to remain in the room.  Moreover, Gladden and Trapnell, upon information and belief, expressly or implicitly allowed Wang to ask confrontational questions to Jill throughout the interrogation, causing Jill to suffer additional duress.

182.   Jill reasonably believed that the only way to have the hospital hold released immediately was to participate in the interrogation, albeit it under extreme duress.

183. At no time during the interrogation did Gladden or Trapnell ever indicate that Jill was free to leave the room or not participate in the interrogation.

184. At no time before, during, or after the interrogation did Gladden or Trapnell inform Jill of her *Miranda* rights.

185. Defendants' coercive interrogation of Jill did not reflect a good faith exercise of Defendants' official responsibilities.

186. Jill was emotionally injured as a result of her coercive interrogation.

187. Gladden and Trapnell acted with malice with the intent to cause the coercive interrogation of Jill and/or acted with a willful and conscious disregard of Jill's rights in a despicable manner.

## NINTH CAUSE OF ACTION

**(*Monell* Related Claims by Plaintiffs against Los Angeles County Department of Children and Family Services, the Office of County Counsel for Los Angeles County, County of Los Angeles, City of Santa Monica Police Department, City of Santa Monica, and DOES 1-20)**

188. Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 187, inclusive.

189. Defendant County of Los Angeles, including through its entity DCFS, and City of Santa Monica, including through its entity SMPD, established and/or followed policies, procedures, customs, and/or practices (hereinafter referred to collectively as "policy" or "policies") which policies were the moving force behind the violations of Plaintiffs' constitutional rights, including those arising under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, by, but not limited to:

a.    the policy of detaining and/or removing children from their family, through the use of hospital holds, without exigent circumstances (imminent danger of serious physical injury), court order, and/or consent;

CALDWELL
LESLIE &
PROCTOR

COMPLAINT

1         b.    the policy of informing parents that they must comply with a

2   physician's request for additional medical tests to be taken of their child or risk

3   having their child detained for the parents' failure to comply with medical advice,

4   even if no exigency exists with respect to the child's medical treatment;

5         c.    the policy of escorting parents and their child to the emergency

6   room in an effort to ensure that the child is admitted into the hospital when neither

7   the child nor parents are under arrest and there are no valid medical reasons for the

8   child to be hospitalized;

9         d.    the policy of not seeking a second medical opinion when the

10   reporter of child abuse is the examining physician and the examining physician

11   cannot definitively state whether the child's injuries are accidental or not;

12         e.    the policy of informing parents that they must keep their child

13   hospitalized, when there is no medical justification for hospitalization and there are

14   no exigent circumstances justifying the temporary detention of the child;

15         f.    the policy of permitting DCFS employees to forge signatures on

16   hospital holds;

17         g.    the policy of failing to rescind a hospital hold when it has been

18   issued erroneously or without legal justification;

19         h.    the policy of issuing hospital holds with no court order, parental

20   consent, or exigent circumstances;

21         i.    the policy of not seeking to reunite parents with their children

22   after finding that one or both parents do not pose a risk to the child's health;

23         j.    the policy of permitting an ARA to veto the consensus decision

24   of a TDM to permit a child to return to the custody of his parents;

25         k.    the policy of permitting/ordering DCFS employees to sign

26   detention reports under the penalty of perjury when they know information

27   contained therein is false.

28

## TENTH CAUSE OF ACTION

**(Violation of State Constitutional Right to Be Free from Unreasonable Search and Seizure by G.J. against Claudia Wang and Susan Land, in Their Individual Capacities, Shawn Rivas, Deborah Ramirez, Yolanda Johnson, Russell Grimmond, Peter Zamfirov, and Amir Pichvai, in Their Individual and Official capacities, Los Angeles County Department of Children and Family Services, the Office of County Counsel for Los Angeles County, County of Los Angeles, City of Santa Monica Police Department, City of Santa Monica, and DOES 1-20.)**

190.   Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 189, inclusive.

191.   G.J. was unlawfully detained without legal authority in violation of Article I, Section 13 of the California Constitution, which prohibits unreasonable search and seizure, on the following occasions:

a.     On March 5, 2010, Grimmond, and Zamfirov stated that if G.J.'s parents did not agree to admit him into the hospital, then G.J. would likely be removed from their custody based upon their refusal to agree to unnecessary medical treatment.  G.J.'s parents thus consented under duress and not of their free will to G.J. being admitted to UCLA-Westwood hospital.  Grimmond and Zamfirov escorted G.J. and his parents to the UCLA-Westwood emergency room, which furthered G.J.'s parents' belief that they had no choice but to comply with Wang's demand for hospitalization.

b.     From March 5, 2010 through March 11, 2010, Wang, Land, Ramirez, Rivas, Johnson, and the ARA conspired to improperly detain G.J. at UCLA-Westwood and UCLA-Santa Monica by informing G.J.'s parents that if they did not comply with Dr. Wang's orders to keep G.J. hospitalized, G.J. would likely be removed from their custody for their refusal of medical treatment.  Upon information and belief, Wang, Land, Ramirez, Rivas, Johnson, and the ARA, each

1  knew that there were no valid legal or medical grounds to require G.J. to be

2  hospitalized, and their threats to G.J.'s parents were intended to keep G.J.

3  improperly detained.

4          c.    Upon information and belief, on March 7, 2010, Ramirez, as an

5  agent of DCFS, improperly issued a hospital hold, thereby detaining G.J., despite

6  the fact that there were no exigent circumstances that justified G.J.'s temporary

7  detention.  Upon information and belief, Ramirez knew that the requirements for a

8  hospital hold were not satisfied and/or recklessly disregarded the legal requirements

9  for issuing a hospital hold.

10          d.    On March 8, 2010, Rivas and Johnson, as agents for DCFS,

11  improperly issued a hospital hold, thereby detaining G.J., despite the fact that there

12  were no exigent circumstances that justified G.J.'s temporary detention.  Upon

13  information and belief, Rivas and Johnson knew that the requirements for a hospital

14  hold were not satisfied and/or recklessly disregarded the legal requirements for

15  issuing a hospital hold.

16          e.    On March 9, 2010, the ARA, as an agent of DCFS, improperly

17  rejected the consensus recommendation of the TDM to permit G.J. to return home

18  with his parents.  Instead, the ARA improperly required G.J. to remain detained

19  pending the Detention Hearing.

20          f.    In his Application for a Writ, Pichvai failed to disclose

21  exculpatory evidence to the Court of Appeal by asserting that "[t]here was

22  uncontroverted medical evidence before the court that the mechanism of the

23  reported fall was not consistent with G.J.'s injuries—that is, G.J. could not have

24  suffered his skull fracture and symmetrical rib fractures on both sides from the same

25  fall."  In addition, Pichvai submitted as evidence the hospital hold issued, upon

26  information and belief, by Ramirez, which Pichvai, upon information and belief,

27  knew or should have known was forged.

28

CALDWELL
LESLIE &
PROCTOR

COMPLAINT

1        192.   Defendants' efforts to detain G.J. did not reflect a good faith exercise

2   of Defendants' official responsibilities.

3        193.   As a direct result of each of the incidents listed in Paragraph 191, G.J.

4   was physically and emotionally injured.

5        194.   Wang, Land, Ramirez, Rivas, Johnson, and the ARA acted with malice

6   with the intent to cause the unreasonable detention of G.J. and/or acted with a

7   willful and conscious disregard of G.J.'s rights in a despicable manner.  In addition,

8   upon information and belief, Ramirez acted fraudulently in forging the signatures of

9   Rivas and Johnson on the hospital hold issued on March 7, 2010 and suggesting that

10  Rivas and Johnson approved the hospital hold, which, upon information and belief,

11  they did not.

12                          **ELEVENTH CAUSE OF ACTION**

13  **(Violation of State Constitutional Right to Familial Association by Jill Jones**

14  **and Michael Jones against Claudia Wang and Susan Land, in Their Individual**

15  **capacities, Shawn Rivas, Deborah Ramirez, Yolanda Johnson,**

16  **Russell Grimmond, Peter Zamfirov, and Amir Pichvai, in Their Individual and**

17  **Official Capacities, Los Angeles Department of Children and Family Services,**

18  **the Office of County Counsel for Los Angeles County, County of Los Angeles,**

19  **City of Santa Monica Police Department, City of Santa Monica, and**

20  **DOES 1-20)**

21       195.   Plaintiffs re-allege and incorporate by reference each and every

22  allegation contained in paragraphs 1 through 194, inclusive.

23       196.   Plaintiffs have a fundamental right under Article I, § 1 of the California

24  Constitution to the care, custody, and control of their child.  *See Fenn v. Sherriff,*

25  109 Cal.App.4th 1466, 1485 (2003).  Defendants named in this cause of action

26  violated Plaintiffs' substantive due process rights by engaging in conduct including,

27  but not limited to, the following:

28

CALDWELL
LESLIE &
PROCTOR

COMPLAINT

1          a.     Wang misrepresenting the purpose of Wang's re-examination of

2  G.J. after he had been initially discharged from the hospital;

3          b.     Grimmond and Zamfirov acting in a manner that suggested Jill

4  was required by law to follow Wang's order and take G.J. to the emergency room

5  when there was no legal or medical reason for G.J. to be hospitalized;

6          c.     Defendants' repeated efforts to remove G.J. from the custody of

7  his parents without legal justification;

8          d.     Defendants' repeated threats that if Jill and Michael did not

9  comply with Wang's hospitalization orders, G.J. would likely be removed from their

10  custody for refusal to follow medical advice;

11          e.     Defendants' decision to seek G.J.'s removal from Michael's

12  custody, despite having absolutely no evidence of physical abuse of any kind by

13  Michael, and having no evidence that G.J. was in imminent danger of serious bodily

14  injury from Michael; and

15          f.     Pichvai's and County Counsel's failure to disclose exculpatory

16  evidence to Commissioner Lewis and the Court of Appeal, his reliance on

17  fraudulent documents, and his deliberate assertion of contradictory explanations of

18  G.J.'s injuries to support his claim of child abuse.

19     197.  The Defendants' efforts to remove G.J. from Jill's and Michael's

20  custody did not reflect a good faith exercise of Defendants' official responsibilities.

21     198.  As a direct result of each of the incidents listed in Paragraph 196,

22  Plaintiffs were each injured.

23     199.  Wang, Land, Thomas, Ramirez, Rivas, Johnson, and the ARA acted

24  with malice with the intent to cause the unreasonable detention of G.J. and/or acted

25  with a willful and conscious disregard of G.J.'s rights in a despicable manner.  In

26  addition, upon information and belief, Ramirez acted fraudulently in forging the

27  signatures of Rivas and Johnson on the hospital hold issued on March 7, 2010, and

28

CALDWELL
LESLIE &
PROCTOR

COMPLAINT

1  suggesting that Rivas and Johnson approved the hospital hold, which, upon

2  information and belief, they did not.

### TWELFTH CAUSE OF ACTION

**(Failure to Comply with Mandatory Duty Not to Unjustifiably Remove Child from Parent's Custody Pursuant to Welfare & Institutions Code Section 309 by All Plaintiffs against Los Angeles County Department of Children and Family Services and DOES 1-20)**

8       200.  Plaintiffs re-allege and incorporate by reference each and every

9  allegation contained in paragraphs 1 through 199, inclusive.

10       201.  California Government Code § 815.6 provides that "[w]here a public

11  entity is under a mandatory duty imposed by an enactment that is designed to protect

12  against the risk of a particular kind of injury, the public entity is liable for an injury

13  of that kind proximately caused by its failure to discharge the duty unless the public

14  entity establishes that it exercised reasonable diligence to discharge the duty."

15       202.  DCFS is under a mandatory duty not to interfere with parents' custody

16  of their child unless certain conditions are met, which did not exist here. *See*

17  Welfare & Insts. Code § 309.

18       203.  DCFS improperly interfered with Jill's and Michael's custody of G.J.

19  on the following occasions:

20       a.      From March 5, 2010 through March 11, 2010, DCFS conspired

21  to improperly detain G.J. at UCLA-Westwood and UCLA-Santa Monica by

22  informing G.J.'s parents that if they did not comply with Wang's orders to keep G.J.

23  hospitalized, G.J. would likely be removed from their custody for their refusal of

24  medical treatment.  Upon information and belief, DCFS knew that there were no

25  valid legal or medical grounds to require G.J. to be hospitalized and their threats to

26  G.J.'s parents were intended to keep G.J. improperly detained.

27

28

CALDWELL
LESLIE &
PROCTOR

COMPLAINT

1    b.      Upon information and belief, on March 7, 2010, DCFS

2  improperly issued a hospital hold, thereby detaining G.J., despite the fact that there

3  were no exigent circumstances that justified G.J.'s temporary detention.

4    c.      On March 8, 2010, DCFS improperly issued a hospital hold,

5  thereby detaining G.J., despite the fact that there were no exigent circumstances that

6  justified G.J.'s temporary detention.

7    d.      On March 9, 2010, DCFS improperly rejected the consensus

8  recommendation of the TDM to permit G.J. to return home with his parents.

9  Instead, DCFS improperly required G.J. to remain detained pending the Detention

10  Hearing.

11    204.  As a direct and proximate result of DCFS's failure to comply with its

12  mandatory duty not to improperly interfere in Jill's and Michael's custody of G.J.,

13  G.J. was physically and emotionally injured and Jill and Michael were emotionally

14  injured.

15  ## THIRTEENTH CAUSE OF ACTION

16  **(Violation of California Civil Code Section 43 by All Plaintiffs against Claudia**

17  **Wang and Susan Land, in Their Individual capacities, Shawn Rivas, Deborah**

18  **Ramirez, Yolanda Johnson, Russell Grimmond, Peter Zamfirov, and Amir**

19  **Pichvai, in Their Individual and Official Capacities, Los Angeles County**

20  **Department of Children and Family Services, the Office of County Counsel for**

21  **Los Angeles County, County of Los Angeles, City of Santa Monica Police**

22  **Department, City of Santa Monica, and DOES 1-20)**

23    205.  Plaintiffs re-allege and incorporate by reference each and every

24  allegation contained in paragraphs 1 through 204, inclusive.

25    206.  The actions of Defendants named in this cause of action have violated

26  Plaintiffs' rights under California Civil Code § 43, which provides, in pertinent part,

27  that every person has "the right of protection from bodily restraint or harm . . . and

28  from injury to his personal relations." Defendants named in this cause of action

CALDWELL
LESLIE &
PROCTOR

COMPLAINT

1   violated Plaintiffs' right under Civil Code § 43 by engaging in conduct including,

2   but not limited to, the following:

3          a.      Wang misrepresenting the purpose of Wang's re-examination of

4   G.J. after he had been initially discharged from the hospital;

5          b.      Grimmond and Zamfirov acting in a manner that suggested Jill

6   was required by law to follow Wang's order and take G.J. to the emergency room

7   when there was no legal or medical reason for G.J. to be hospitalized;

8          c.      Defendants' repeated efforts to remove G.J. from the custody of

9   his parents without legal justification;

10         d.      Defendants' repeated threats that if Jill and Michael did not

11  comply with Wang's hospitalization orders, G.J. would likely be removed from their

12  custody for refusal to follow medical advice;

13         e.      Defendant's decision to seek G.J.'s removal from Michael's

14  custody, despite having absolutely no evidence of physical abuse of any kind by

15  Michael, and having no evidence that G.J. was in imminent danger of serious bodily

16  injury from Michael; and

17         f.      Pichvai's and County Counsel's failure to disclose exculpatory

18  evidence to Commissioner Lewis and the Court of Appeal, his reliance on

19  fraudulent documents, and his deliberate assertion of contradictory explanations of

20  G.J.'s injuries to support his claim of child abuse.

21      207.   Defendants' efforts to detain G.J. did not reflect a good faith exercise

22  of Defendants' official responsibilities.

23      208.   As a direct result of each of the incidents listed in Paragraph 206,

24  Plaintiffs were each injured.

25      209.   Wang, Land, Thomas, Ramirez, Rivas, Johnson, and the ARA acted

26  with malice with the intent to cause the unreasonable detention of G.J. and/or acted

27  with a willful and conscious disregard of G.J.'s rights in a despicable manner.  In

28  addition, upon information and belief, Ramirez acted fraudulently in forging the

1  signatures of Rivas and Johnson on the hospital hold issued on March 7, 2010, and

2  suggesting that Rivas and Johnson approved the hospital hold, which, upon

3  information and belief, they did not.

4

5                          **<u>PRAYER FOR RELIEF</u>**

6          1.      WHEREFORE, Plaintiffs hereby pray that judgment be awarded in

7  their favor and against all Defendants as follows:

8          1.      For actual and consequential damages according to proof;

9          2.      For punitive damages;

10         3.      For all fees and costs of suit to which he is entitled by law; and

11         4.      For such other and further relief as the Court deems appropriate and

12  proper.

13

14

15

16  DATED: April **4**, 2011              Respectfully submitted,

17                                        CALDWELL LESLIE & PROCTOR, PC
                                          MICHAEL J. PROCTOR
18                                        ROBYN C. CROWTHER

19

20

21                                        By _____
                                               MICHAEL J. PROCTOR
22                                        Attorneys for Plaintiffs
23                                        MICHAEL N. JONES, JILL JONES, and G.J.

24

25

26

27

28

CALDWELL
LESLIE &
PROCTOR

-56-

COMPLAINT

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge S. James Otero and the assigned discovery Magistrate Judge is Jay C. Gandhi.

The case number on all documents filed with the Court should read as follows:

## CV11- 2851 SJO (JCGx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=================================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| | | |
|---|---|---|
| [X] **Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | [ ] **Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | [ ] **Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

MICHAEL N. JONES, an individual; JILL
JONES, an individual; and G.J., an
individual

PLAINTIFF(S)

v.

COUNTY OF LOS ANGELES; LOS ANGELES
COUNTY DEPARTMENT OF CHILDREN AND
FAMILY SERVICES; (see attachment)

DEFENDANT(S).

CASE NUMBER

**CV11-02851**SJO(JCbx)

**SUMMONS**

TO:   DEFENDANT(S): (see attachment)

A lawsuit has been filed against you.

Within 21_____ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached [x] complaint [ ] _____ amended complaint [ ] counterclaim [ ] cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, MICHAEL J. PROCTOR_____ , whose address is 1000 Wilshire Boulevard, Suite 600, Los Angeles, CA 90017-2463_____ . If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

APR - 5 2011

Dated: _____

By: _____

Deputy Clerk

(Seal of the Court)

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

CV-01A (12/07)                               **SUMMONS**                                              CCD-1A

## ATTACHMENT TO SUMMONS
## LIST OF DEFENDANTS

COUNTY OF LOS ANGELES;

LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES;

THE OFFICE OF COUNTY COUNSEL FOR LOS ANGELES COUNTY;

CITY OF SANTA MONICA;

CITY OF SANTA MONICA POLICE DEPARTMENT;

CLAUDIA WANG, an individual;

SHAWN RIVAS, an individual;

DEBORAH RAMIREZ, an individual;

YOLANDA JOHNSON, an individual;

SUSAN LAND, an individual;

AMIR PICHVAI, an individual;

PETER ZAMFIROV, an individual;

RUSSELL GRIMMOND, an individual;

LESLIE TRAPNELL, an individual; and

LLOYD GLADDEN, an individual.

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

| I (a) PLAINTIFFS   (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| MICHAEL N. JONES, an individual; JILL JONES, an individual; and G.J., an individual | COUNTY OF LOS ANGELES; LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES; (see attachment) |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| MICHAEL J. PROCTOR, State Bar No. 148235<br>ROBYN C. CROWTHER, State Bar No. 193840<br>CALDWELL LESLIE & PROCTOR, PC<br>1000 Wilshire Boulevard, Suite 600<br>Los Angeles, California 90017-2463<br>Telephone: 213-629-9040 | |

**II.  BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff       ☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant   ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III.  CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV.  ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V.  REQUESTED IN COMPLAINT:  JURY DEMAND:** ☒ Yes   ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☒ No        ☐ **MONEY DEMANDED IN COMPLAINT: $**

**VI.  CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause.  Do not cite jurisdictional statutes unless diversity.)

42 U.S.C. Section 1983, fourth and fifth amendments to United States Constitution. Parents and minor child bring this action related, in part, to the violation of their civil rights resulting from an unfounded accusation of child abuse.

**VII.  NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITION | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 630 Liquor Laws | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 640 R.R. & Truck | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | REAL PROPERTY | ☐ 445 American with Disabilities - Employment | ☐ 650 Airline Regs | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | REAL PROPERTY | ☐ 210 Land Condemnation | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety/Health | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | ☐ 220 Foreclosure | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 230 Rent Lease & Ejectment | IMMIGRATION | | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 240 Torts to Land | ☐ 245 Tort Product Liability | ☐ 463 Habeas Corpus-Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | ☐ 290 All Other Real Property | ☒ 440 Other Civil Rights | | ☐ 871 IRS - Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | ☐ 465 Other Immigration Actions | | |

**CV11- 02851**

**FOR OFFICE USE ONLY:**  Case Number:

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? [X] No [ ] Yes

If yes, list case number(s):

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? [X] No [ ] Yes

If yes, list case number(s):

**Civil cases are deemed related if a previously filed case and the present case:**

(Check all boxes that apply)

[ ] A. Arise from the same or closely related transactions, happenings, or events; or

[ ] B. Call for determination of the same or substantially related or similar questions of law and fact; or

[ ] C. For other reasons would entail substantial duplication of labor if heard by different judges; or

[ ] D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.

[ ] Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.

[ ] Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.

**Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties

Note: In land condemnation cases, use the location of the tract of land involved

**X. SIGNATURE OF ATTORNEY (OR PRO PER):** _(signature)_ Date 4 April 2011

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

## ATTACHMENT TO CIVIL COVER SHEET
## LIST OF DEFENDANTS

COUNTY OF LOS ANGELES;

LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES;

THE OFFICE OF COUNTY COUNSEL FOR LOS ANGELES COUNTY;

CITY OF SANTA MONICA;

CITY OF SANTA MONICA POLICE DEPARTMENT;

CLAUDIA WANG, an individual;

SHAWN RIVAS, an individual;

DEBORAH RAMIREZ, an individual;

YOLANDA JOHNSON, an individual;

SUSAN LAND, an individual;

AMIR PICHVAI, an individual;

PETER ZAMFIROV, an individual;

RUSSELL GRIMMOND, an individual;

LESLIE TRAPNELL, an individual; and

LLOYD GLADDEN, an individual.