1  CALDWELL LESLIE & PROCTOR, PC
   MICHAEL J. PROCTOR, State Bar No. 148235
2    *proctor@caldwell-leslie.com*
   ROBYN C. CROWTHER, State Bar No. 193840
3    *crowther@caldwell-leslie.com*
   1000 Wilshire Boulevard, Suite 600
4  Los Angeles, California  90017-2463
   Telephone: (213) 629-9040
5  Facsimile: (213) 629-9022

6  Attorneys for Plaintiffs
   MICHAEL N. JONES, JILL JONES, and G.J.
7

8

**COPY**

CLERK US DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES
2011 AUG 10  PM 12: 57
FILED

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

9
10 | MICHAEL N. JONES, an individual; JILL JONES, an individual; and G.J., an individual,

11       Plaintiffs,

12       v.

13 | COUNTY OF LOS ANGELES;
14 | LOS ANGELES COUNTY
   | DEPARTMENT OF CHILDREN AND
15 | FAMILY SERVICES; THE OFFICE
   | OF COUNTY COUNSEL FOR
16 | LOS ANGELES COUNTY; CITY OF
   | SANTA MONICA; CITY OF SANTA
17 | MONICA POLICE DEPARTMENT;
   | CLAUDIA WANG, an individual;
18 | SHAWN RIVAS, an individual;
   | DEBORAH RAMIREZ, an individual;
19 | YOLANDA JOHNSON, an individual;
   | ASAYE TSEGGA, and individual;
20 | SUSAN LAND, an individual;
   | AMIR PICHVAI, an individual;
21 | PETER ZAMFIROV, an individual;
   | RUSSELL GRIMMOND, an
22 | individual; LESLIE TRAPNELL, an
   | individual; and LLOYD GLADDEN,
23 | an individual,

24       Defendants.

Case No. CV 11-02851 SJO (JCGx)
**FIRST AMENDED COMPLAINT FOR**
1)  **FALSE IMPRISONMENT,**
2)  **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS,**
3)  **NEGLIGENCE,**
4)  **DECEIT,**
5)  **VIOLATION OF TITLE 42 U.S.C. SECTION 1983 (FOURTH AMENDMENT),**
6)  **VIOLATION OF TITLE 42 U.S.C. SECTION 1983 (SUBSTANTIVE DUE PROCESS),**
7)  **VIOLATION OF FEDERAL CONSTITUTIONAL RIGHT TO BE FREE FROM COERCIVE INTERROGATION,**
8)  **VIOLATION OF STATE CONSTITUTIONAL RIGHT TO BE FREE FROM COERCIVE INTERROGATION,**
9)  ***MONELL* CLAIMS,**
10) **VIOLATION OF STATE CONSTITUTIONAL RIGHT TO BE FREE FROM UNREASONABLE SEARCH AND SEIZURE,**
11) **VIOLATION OF STATE CONSTITUTIONAL RIGHT TO FAMILIAL ASSOCIATION,**
12) **WELFARE & INSTITUTIONS CODE SECTION 309 (FAILURE TO COMPLY), AND**
13) **VIOLATION OF CALIFORNIA CIVIL CODE SECTION 43**

**JURY TRIAL DEMANDED**

25
26
27
28

CALDWELL
LESLIE &
PROCTOR

# INTRODUCTION

1.    On February 24, 2010, Jill Jones ("Jill") experienced a terrible accident: she fell down the stairs of her home while carrying her infant son, G.J., which caused G.J. to slip out of her arm and hit his head on a stair below. Distraught, Jill rushed G.J. to the hospital to discover that G.J. had suffered a serious fracture of his skull. Fortunately, G.J. would fully recover from his injuries.

2.    When Jill brought G.J. to the University of California, Los Angeles ("UCLA") emergency room that fateful evening, her sole concern was for her child's welfare. She had no notion that she and her husband, Michael Jones ("Michael"), were about to step into a parent's worst nightmare of being falsely accused of physically abusing their child and having G.J. taken from them for months before a court eventually exonerated them. The nightmare was initiated by a UCLA physician, Dr. Claudia Wang, who appeared determined to accuse Jill and Michael of child abuse, despite a lack of medical evidence to justify her conclusion. But a cast of other actors, including hospital staff, police officers, social workers, and County Counsel all utterly failed to perform their essential duties of investigating such serious allegations, and protecting the rights of the parents and child against false allegations of child abuse. By abdicating their duties, the Defendants caused G.J. to be stripped from his parents' care, without cause, for months—precious time in a young child's life that Jill, Michael, and G.J. cannot recover.

3.    Ironically, the only "evidence" of G.J.'s physical abuse relied on by Wang was a result of UCLA's own failure to properly diagnose G.J.'s injuries. When G.J. was first admitted to UCLA, doctors quickly determined that G.J. had a skull fracture, but they failed to discover rib fractures, which, significantly, were not displaced at the time. The rib fractures, like the skull fractures, were the result of the fall. Despite the fact that Jill repeatedly reported to UCLA medical personnel that she heard popping sounds in G.J.'s chest, a certain indication of rib fractures,

CALDWELL
LESLIE &
PROCTOR

-1-

1    the UCLA physicians failed to do standard tests that would have revealed rib

2    fractures.

3        4.    UCLA's failure to diagnose rib fractures would not have posed a

4    significant problem but for the fact that Wang, a UCLA physician who led UCLA's

5    child abuse review team, decided, days after G.J. had been discharged from the

6    hospital, to further review G.J.'s injury for signs that it was not accidental.  To do

7    so, Wang directed Jill to bring G.J. back to the hospital under false pretenses.

8        5.    During the second visit, a full skeletal exam revealed G.J.'s rib injuries

9    from the fall, which had since become displaced and therefore more easily

10   recognized.  Soon thereafter, Wang falsely concluded, without any credible medical

11   evidence, and likely in an effort to confirm her preconceived notions, that the rib

12   fractures occurred more recently than the skull fracture and were therefore evidence

13   of child abuse.  She then reported her false allegations of suspected child abuse to

14   the City of Santa Monica Police Department ("SMPD") and the Los Angeles County

15   Department of Children and Family Services ("DCFS").

16       6.    The fact that Wang was an overzealous and false reporter of child

17   abuse who misattributed G.J.'s injuries should not have resulted in G.J. being taken

18   away from his parents, if only the government agencies (including SMPD, DCFS,

19   and The Office of County Counsel for Los Angeles County ("County Counsel") had

20   done their job.  Each of these agencies has duties and obligations to conduct

21   thorough, objective investigations of child-abuse allegations, and to duly protect the

22   civil liberties of the accused before taking the extraordinary steps of removing a

23   child from the parents' custody.

24       7.    This case, however, reflects the systemic failure at every level, and by

25   every agency, which permitted Wang to circumvent and manipulate the checks

26   intended to protect against malicious and baseless accusations of child abuse and

27   resulted in the unlawful detention of G.J.

28

CALDWELL
LESLIE &
PROCTOR

8.     Despite the fact that Wang initiated the child-abuse claim against Jill and Michael—while simultaneously refusing ever to state definitively that G.J.'s injuries were not accidental—DCFS abdicated its duties by not conducting an independent investigation and instead deferring *entirely* to Wang's baseless, equivocal, and contradictory conclusions.  DCFS agreed on multiple occasions to unlawfully detain G.J., including, but not limited to, using its authority to detain G.J. in the hospital, without court order, despite the fact that no exigent circumstances existed to justify such a detention.  *DCFS even forged official detention documents in an effort to placate Wang.*

9.     The SMPD abdicated its duties by failing to protect the civil liberties of the Joneses and, instead, overtly assisted Wang's personal crusade by unlawfully detaining G.J. and later permitting Wang to conduct a custodial interrogation of Jill without alerting Jill to her *Miranda* rights.

10.    County Counsel abdicated its duties by not only failing to objectively review the specious evidence set forth by Wang and blindly relied on by DCFS, but also by relying upon forged DCFS documents that ordered G.J.'s detention, and intentionally misrepresenting the evidentiary record to the Court of Appeal.

11.    Because Wang rushed to judgment in making her false claim of child abuse and improperly involved herself in the child abuse investigation after making her report, and because City and County agencies wholly failed to perform their duties and protect the civil liberties of the Joneses, G.J. was removed from his parents' custody for more than two months, until the court ultimately held that Wang's accusations were baseless and expressly criticized Wang for manipulating her story in a desperate attempt to seek G.J.'s detention.  In fact, at the conclusion of the detention hearing, the Commissioner said that it was the first time in nearly twenty years of hearing such cases that she observed a physician alter her testimony while the parents' testimony remained consistent from beginning to end.

CALDWELL
LESLIE &
PROCTOR

12.     The removal of G.J. from his parents' custody was emotionally devastating for the Joneses and also caused Jill to lose the ability to breastfeed G.J. In addition, the months of scrutiny that Jill and Michael faced from their extended family and co-workers as falsely accused child abusers were humiliating and emotionally scarring.

## JURISDICTION

13.     Plaintiffs assert that this Court has jurisdiction, pursuant to 28 U.S.C. § 1331, over Plaintiffs' claims asserted under 42 U.S.C. § 1983 for violations of Plaintiffs' rights under the United States Constitution, including those under the Fourth, Fifth, and Fourteenth Amendments.  In addition, Plaintiffs assert that the Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over Plaintiffs' claims asserted under the California Constitution and California State laws.

## PARTIES

14.     At all times relevant to this Complaint, Plaintiffs were residents of Los Angeles County, California.  Plaintiff MICHAEL N. JONES is the father of minor Plaintiff G.J., and Plaintiff JILL JONES is the mother of minor Plaintiff G.J. At the time the incident giving rise to the causes of action in the Complaint began, Plaintiff G.J. was two and a half months old.

15.     At all times applicable herein, Defendant COUNTY OF LOS ANGELES was and is a public entity.

16.     At all times applicable herein, Defendant LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES was and is a subdivision or entity of the COUNTY OF LOS ANGELES.

17.     At all times applicable herein, Defendant THE OFFICE OF COUNTY COUNSEL FOR LOS ANGELES COUNTY was and is a subdivision or entity of the COUNTY OF LOS ANGELES.

18.     At all times applicable herein, Defendant CITY OF SANTA MONICA was and is a public entity.

CALDWELL
LESLIE &
PROCTOR

19.     At all times applicable herein, Defendant CITY OF SANTA MONICA POLICE DEPARTMENT was and is a subdivision or entity of the City of Santa Monica.

20.     At all times applicable herein, Defendant CLAUDIA WANG was an individual residing, on information and belief, in the County of Los Angeles, and an officer, agent, and employee of The Regents of the University of California, working at the UCLA Medical Center in Westwood.

21.     At all times applicable herein, Defendant SHAWN RIVAS, a DCFS child social worker, was an individual residing, on information and belief, in the County of Los Angeles, and an officer, agent, and employee of the County of Los Angeles and DCFS.

22.     At all times applicable herein, Defendant DEBORAH RAMIREZ, a DCFS senior child social worker, was an individual residing, on information and belief, in the County of Los Angeles, and an officer, agent, and employee of the County of Los Angeles and DCFS.

23.     At all times applicable herein, Defendant YOLANDA JOHNSON, a DCFS senior child social worker, was an individual residing, on information and belief, in the County of Los Angeles, and an officer, agent, and employee of the County of Los Angeles and DCFS.  At all times applicable herein, Defendant ASAYE TSEGGA, a DCFS Assistant Regional Administrator, was an individual residing, on information and belief, in the County of Los Angeles, and an officer, agent, and employee of the County of Los Angeles and DCFS.

24.     At all times applicable herein, Defendant SUSAN LAND was an individual residing, on information and belief, in the County of Los Angeles, and an officer, agent, and employee of The Regents of the University of California, working as a social worker at the UCLA Medical Center in Westwood.

CALDWELL
LESLIE &
PROCTOR

-5-

25.     At all times applicable herein, Defendant AMIR PICHVAI was an individual residing, on information and belief, in the County of Los Angeles, and an agent of the County of Los Angeles and County Counsel.

26.     At all times applicable herein, Defendant PETER ZAMFIROV, an officer with the SMPD, was an individual residing, on information and belief, in the County of Los Angeles, and an officer, agent, and employee of the City of Santa Monica and the SMPD.

27.     At all times applicable herein, Defendant RUSSELL GRIMMOND, an officer with the SMPD, was an individual residing, on information and belief, in the County of Los Angeles, and an officer, agent, and employee of the City of Santa Monica and the SMPD.

28.     At all times applicable herein, Defendant LESLIE TRAPNELL, a detective with the SMPD, was an individual residing, on information and belief, in the County of Los Angeles, and an officer, agent, and employee of the City of Santa Monica and the SMPD.

29.     At all times applicable herein, Defendant LLOYD GLADDEN, a detective with the SMPD, was an individual residing, on information and belief, in the County of Los Angeles, and an officer, agent, and employee of the City of Santa Monica and the SMPD.

30.     Plaintiffs are ignorant of the true names and capacities of those Defendants sued herein as DOES 1 through 20, and for that reason have sued such Defendants under fictitious names.

31.     Plaintiffs are informed and believe and on such basis allege that at all relevant times, Defendants, and each of them, were the knowing agents and/or alter egos of one another, and/or the Defendants directed, ratified, and/or approved the conduct of each of the other Defendants and each of their agents or employees, and are therefore vicariously liable for the acts and omissions of their co-defendants, their agents and employees, as more fully alleged herein.

CALDWELL
LESLIE &
PROCTOR

# GENERAL ALLEGATIONS

32.     Jill and Michael are both lawyers who met on their first day as law students at Boalt Hall, Berkeley School of Law.  Jill, an academic All-American and varsity volleyball player at the University of Massachusetts, where she double-majored in English and Political Science and was named one of the Top Ten College Women by *Glamour* Magazine in 1999, was awarded a Master's in Sociology of Law before she went to law school.  Michael was awarded a Bachelor's (First Class Honors) from Oxford University in his native England and a Ph.D. from Stanford University.  Prior to law school, he was awarded many prestigious fellowships and academic prizes, taught Literature at Fordham and Stanford universities, and published in the field of Medieval Literature.  Michael and Jill married in 2008 after moving from Northern California to Los Angeles, where Jill accepted her dream job in the social services division at County Counsel and where they would be closer to Jill's parents, siblings, and extended family.  They are both members in good standing of the California Bar.

33.     In 2009, Jill and Michael learned they were expecting their first baby, who would be named G.J.  Jill was still working at County Counsel for DCFS when she became pregnant with G.J., and Michael was an associate lawyer at the law firm of Greenberg Traurig, LLP.

34.     G.J. was born at UCLA Medical Center in Santa Monica at 36 weeks-gestation on December 9, 2009, via cesarean section because doctors suspected he had a heart condition and Intrauterine Growth Restriction.  Both G.J. and Jill were released from the hospital four days after he was born.  Doctors' initial concerns were allayed, and G.J. was given a clean bill of health.

35.     G.J. is the first baby for Jill and Michael.  Like most first-time parents, they were thrilled at G.J.'s arrival and quickly bonded with their son.  Both Jill and Michael took leave from their jobs to stay home with G.J. in his first weeks, and they each took responsibility for the various tasks that accompany raising a

1  newborn.  While Michael returned to work following his paternity leave in January

2  2010, Jill remained on maternity leave and cared for G.J. full-time.

3       36.    Jill treasured her time at home with G.J.  She regularly nursed G.J. and

4  quickly settled into a regular schedule with his feedings and naps.  G.J. was a happy

5  baby, and Jill and Michael were proud parents.

6       37.    Over the two months following his birth, G.J. saw doctors on a regular

7  basis.  He had follow-up appointments to check on his possible heart condition, and

8  doctors ultimately concluded that his cardiac function was normal.  In addition, like

9  many new parents, Michael and Jill closely monitored their son's health and

10  contacted their pediatrician at the sign of even minor symptoms.  For example, Jill

11  took G.J. to his pediatrician after he developed a cough.  Jill also brought G.J. to his

12  pediatrician to make sure he was healthy enough to fly with Jill and Michael to San

13  Francisco.  Over the mere two and half months following his birth, Jill brought G.J.

14  to his pediatrician and other physicians on multiple occasions for various check-ups

15  and, on each occasion, G.J. was given a clean bill of health, and absolutely no signs

16  of child abuse were ever detected or reported.

17              *G.J. Is Injured When Jill Accidentally Falls*

18       38.    Wednesday, February 24, 2010, began as a typical day in the Joneses'

19  household.  Michael left for work, and Jill took care of G.J., who was two and a half

20  months old at the time.  Jill had arranged to meet her sister and her nephews at The

21  Grove shopping center in mid-town Los Angeles.  Despite the day being overcast

22  and slightly rainy, Jill and G.J. traveled to The Grove.  Jill and G.J. returned home in

23  the early afternoon.

24       39.    After they arrived back home, Jill began making dinner and gave G.J. a

25  bath once he woke up from his nap.  After G.J. fell back asleep, Jill briefly checked

26  her email in the Joneses' office, which is located upstairs from the Joneses' kitchen.

27  Jill heard G.J. wake up, and she went to the den, where he was sleeping in his car

28

CALDWELL
LESLIE &
PROCTOR

1  seat.  She picked up G.J. and then returned upstairs, G.J. in her arms, to finish

2  checking her email until the dinner was ready.

3      40.    Jill nursed G.J., and he fell back asleep in her arms.  At that point, Jill

4  headed downstairs, carrying G.J., to check on her meal.  Jill recalls positioning G.J.

5  in her left arm, with his head nestled in her left elbow, as she walked down the wood

6  staircase leading from the computer room to the main floor with the kitchen.

7      41.    As she descended the stairs, Jill slipped suddenly and, as she fell, G.J.

8  slipped out from her arm and fell to the bottom of the staircase.

9      42.    Jill was understandably panic-stricken and rushed downstairs to pick up

10  G.J.  She recalls screaming hysterically as G.J. did the same.  She immediately

11  decided to take G.J. to the emergency room and knew that she could get to the Santa

12  Monica UCLA Medical Center ("UCLA-Santa Monica") emergency room faster by

13  driving herself rather than by ambulance.  Jill quickly placed a call to Michael, who

14  was at work, to inform him that she and G.J. had fallen and that she was taking him

15  to the emergency room.  Jill saw G.J.'s car seat in the living room, placed G.J. in it,

16  and raced outside toward her car.  When she got outside, however, she realized that

17  she could not find her car keys and, at that point, intended to run, carrying G.J. to

18  the hospital two blocks away.

19      43.    At that moment, Jill's next door neighbor stepped outside to take out

20  her trash.  She heard G.J. screaming and walked over to investigate.  Jill was visibly

21  upset and the neighbor asked Jill what had happened.  Jill recounted that she had

22  fallen with G.J. and wanted to take him to the hospital but could not find her keys.

23  Jill's neighbor offered to drive and they left in the neighbor's car for the short drive

24  to UCLA-Santa Monica.

25      44.    Jill's neighbor dropped off Jill and G.J. at the emergency room at

26  approximately 6:30 p.m., and they rushed inside.  Approximately five minutes later,

27  Michael, who had left work immediately after receiving the call, arrived at the

28  emergency room, also distraught.  Michael joined Jill in the emergency room, where

CALDWELL
LESLIE &
PROCTOR

-9-

they watched G.J. as doctors examined him.  Michael noticed a mark on G.J.'s head and Jill realized that G.J. must have hit his head on the stairs as he fell.  G.J. was rushed off for a CT scan to check for internal head injuries.

45.     Upon review of the CT scan, doctors discovered that G.J. had a skull fracture and informed Michael and Jill that if the doctors determined that there was any bleeding in G.J.'s brain, G.J. would need to be transferred to UCLA's Westwood Medical Center ("UCLA-Westwood") to see a neurological specialist. Michael and Jill were indescribably upset and concerned for the health of their son.

46.     Doctors later diagnosed G.J. with a fracture to the right side of his skull—a parieto-occipital skull fracture with a possible hematoma, or bleeding, underneath the fracture.  Doctors reviewed G.J.'s chest x-ray and blood work and did not discover any other injuries.  Based upon the possible hematoma, however, doctors determined that G.J. needed to be transferred to UCLA-Westwood to see a neurological expert.

47.     Upon information and belief, hospital staff at UCLA-Santa Monica made a routine call to DCFS at 9:04 p.m. to report G.J.'s injuries to DCFS and to inform DCFS that G.J.'s injuries were consistent with Jill's explanation that she had accidentally fallen on the stairs.  Upon information and belief, it is UCLA-Santa Monica's standard practice to contact DCFS to report any serious injury to a child, whether the injury has been determined to be accidental or non-accidental.

48.     Upon information and belief, DCFS took no action based on UCLA-Santa Monica's report of G.J.'s injuries because DCFS concluded that there were no indications that G.J.'s injuries were non-accidental.

49.     At 9:30 p.m. G.J. was transferred by ambulance to UCLA-Westwood. Michael rode in the front seat of the ambulance while Jill planned on driving Michael's car to the hospital, as only one parent was allowed to travel with G.J.  As the ambulance was leaving UCLA-Santa Monica, Michael saw that Jill was unable to find his car in the parking lot.  He quickly asked the ambulance to stop, jumped

out of the ambulance and ran over to Jill, yelling to let her know where his car was parked. Michael returned to the ambulance and they proceeded to UCLA-Westwood.

50.     After arriving at UCLA-Westwood, G.J. had a second CT scan at approximately 2:40 a.m. Jill and Michael remained by G.J.'s side and anxiously waited while doctors determined whether G.J. would need to have emergency surgery. At 6:00 a.m., doctors informed Jill and Michael that surgery would not be necessary, and Jill was allowed, for the first time since she had taken G.J. to the hospital, to feed G.J. Because doctors did not yet allow Jill and Michael to hold G.J., Jill fed G.J. expressed breast milk from a bottle.

51.     Jill and Michael had not been able to hold G.J. since they arrived at the hospital. Once they were allowed to pick up their son later that morning, each time they held him, they placed a pillow between themselves and G.J. to offer a cushion and to prevent their body from interfering with the wires and tubes connected to G.J. to monitor his vital signs, including the "halo" he wore to monitor for signs of seizures.

52.     Later that morning, on February 25, 2010, after making it through a sleepless night and suffering from incredible stress regarding the health of their son, the Joneses were quietly spending time feeding G.J. in his hospital room, thankful that he was on his way to recovery. A UCLA social worker, Eve Beerman, entered their room unannounced and sought to engage the Joneses in conversation. Michael, who was holding G.J. for the first time since the accident, did not respond to Beerman, which, according to a later report written by Beerman, she interpreted as Michael being "rude" to her. Beerman noted this interaction in G.J.'s medical file.

### G.J. Is Discharged on February 26, 2010, Despite Jill's Concerns about a Popping Sound in G.J.'s Chest

53.     G.J. remained in the hospital all day Thursday, February 25, 2010 for observation. At approximately 1:00 p.m. on Friday, February 26, 2010 a nurse

CALDWELL
LESLIE &
PROCTOR

1   informed Jill and Michael that G.J. was being discharged and they could take him

2   home.  Michael and Jill had concerns about such an early release and called G.J.'s

3   pediatrician to voice such concerns.  In addition, when Jill picked G.J. up for the

4   first time without a pillow, she noticed an audible popping sound coming from

5   G.J.'s chest.  The nurse confirmed the popping sound but told Jill that her son had

6   been seen by the top doctors in the country, that her son had been discharged and

7   that she should go home.

8        54.    Jill insisted on having a physician examine G.J.'s chest before she took

9   him home.  A physician came to examine G.J. and, although he confirmed the

10   existence of the popping sounds after simply touching G.J.'s chest, he concluded

11   that there was no problem with G.J.'s chest and that G.J. was again cleared to be

12   discharged.  The doctor did not order a second chest x-ray to confirm that the

13   popping sounds were not rib fractures.  These interactions are both noted in G.J.'s

14   medical file.

15        55.    Based upon the nurse's and doctor's assurances that G.J. did not have

16   any undiagnosed injuries, Jill and Michael agreed to take G.J. home.  Before leaving

17   the hospital, however, Jill called G.J.'s pediatrician to schedule a check-up

18   appointment for the following Monday morning.

19        56.    Upon information and belief, the popping sounds heard by Jill, the

20   nurse, and the doctor were a result of bilateral posterior lateral rib fractures, which

21   were not detected in the chest x-rays taken of G.J. on February 24, 2010.  Upon

22   information and belief, the left-side rib fractures became displaced at some point

23   between the time the chest x-ray was taken of G.J. on February 24, 2010, and when

24   Jill picked up G.J. for the first time without a pillow, on February 26, 2010, and first

25   heard the popping sounds in G.J.'s chest.  Upon information and belief, the popping

26   sounds were indicative of a displaced rib fracture in G.J.'s chest.  Jill and Michael

27   were unaware at the time, however, of what was causing the popping sound.

28

CALDWELL
LESLIE &
PROCTOR

57.     Over the weekend, Jill and Michael continued to notice the popping sound emanating from G.J.'s chest.  In the days after G.J. returned home from the hospital, he required Jill's constant attention and would not sleep without being held.  On Monday, March 1, 2010, Jill took G.J. to his appointment with his pediatrician, at which she reported that she continued to hear a popping sound in G.J.'s chest and that G.J. appeared to experience pain when his chest popped.  G.J.'s pediatrician examined him and concluded that the popping was not indicative of any injury.  He instructed Jill to give G.J. Tylenol regularly.  Jill was dissatisfied with the pediatrician's diagnosis, but did not know of anywhere else to turn for better medical advice.

### *UCLA-Westwood's SCAN Team Reviews G.J.'s Case and Wang Demands Further Testing to Support Her Unfounded Suspicions that G.J.'s Injuries Were Non-Accidental*

58.     Upon information and belief, on Thursday, March 4, 2010, the Suspected Child Abuse and Negligence ("SCAN") team at UCLA-Westwood discussed G.J.'s injuries based upon a referral from a child-life specialist at UCLA-Westwood who noted the severity of G.J.'s injuries but did not note any other basis to indicate that the injuries were non-accidental.  Upon information and belief, Defendant Dr. Claudia Wang served as the medical director of the SCAN team and reviewed G.J.'s file following the referral from the child-life specialist.

59.     Upon information and belief, following her review of G.J.'s medical records, Wang immediately began to suspect, without a valid factual basis, that G.J.'s injuries were non-accidental.  Upon information and belief, Wang recognized that her hypothesis was unsupported by the current evidence, so she concocted a plan to conduct additional, unwarranted medical tests on G.J. in an attempt to confirm her unfounded suspicions.

60.     Wang first concluded that she wanted G.J. to undergo additional tests that would potentially confirm that G.J. had been physically abused.  Specifically,

CALDWELL
LESLIE &
PROCTOR

1   she wanted G.J. to undergo an ophthalmological exam, which could reveal

2   symptoms of Shaken Baby Syndrome, as well as a full skeletal x-ray to look for

3   other fractures.

4        61.    Upon information and belief, Wang contacted G.J.'s pediatrician and

5   instructed him to tell Jill to bring G.J. back to UCLA for further testing under the

6   guise that the testing was routine and medically necessary, and not because Wang

7   suspected that G.J. was a victim of child abuse.

8        62.    Upon information and belief, G.J.'s pediatrician thereafter telephoned

9   Jill and told her that G.J. had been released from the hospital "too early" and that,

10   based upon the types of injuries G.J. suffered, the hospital should have conducted a

11   full skeletal exam and an ophthalmological exam.  G.J.'s pediatrician asked Jill to

12   return to UCLA-Westwood the following day, Friday, for the additional, supposedly

13   medically necessary tests.

14        63.    Shortly after Jill received the call from G.J.'s pediatrician, Wang called

15   Jill to repeat the request that Jill bring G.J. to UCLA-Westwood for additional tests.

16   Wang expressly informed Jill that she should not be alarmed about bringing G.J.

17   back to the hospital and assured her that the tests were "routine".  Jill expressed to

18   Wang her hope that the additional tests would provide a satisfactory explanation for

19   the popping sounds she was still hearing in G.J.'s chest.

20        ***Jill Brings G.J. to UCLA-Westwood for Additional Tests***

21        64.    Pursuant to Wang's request, Jill arrived at UCLA's Jules Stein Eye

22   Clinic in Westwood at 8:30 a.m. on Friday, March 5, 2010.  G.J. underwent

23   diagnostic testing, including dilation of his pupils, to determine whether he had

24   retinal hemorrhages; the results were negative—no retinal hemorrhages were found.

25   Upon information and belief, the results were communicated to Wang, who was

26   disappointed that her hypothesis was not yet confirmed.  Indeed, upon information

27   and belief, Wang ordered the eye test conducted two more times, without any

28   justification, and with the same result.

CALDWELL
LESLIE &
PROCTOR

-14-

65.     Following the ophthalmological exam, and prior to meeting with Wang, Jill was instructed to take G.J. to the neighboring clinic to have a full skeletal exam, which involves a technician wedging G.J. down between brick-like objects on a table so that the technician may take multiple x-rays of G.J.

66.     Following completion of the skeletal x-rays in the early afternoon, Jill was instructed to wait for Wang to interview her.  Jill had been regularly breastfeeding G.J. and was hungry at the time as she had not had anything to eat since arriving at the hospital at 8:00 a.m. that morning.

67.     Upon information and belief, radiologists reviewed the skeletal x-rays and diagnosed G.J. with bilateral, symmetrical, lateral posterior fractures on the sixth and seventh ribs, meaning that G.J. had fractures on both sides of his rib cage, toward the sides of the sixth and seventh ribs.  Upon information and belief, the radiologists called Wang and, after reviewing the x-rays together, the radiologists and Wang confirmed the rib fracture diagnosis.  Upon information and belief, Wang and the radiologists knew that because the bilateral fractures were symmetrical, they likely occurred at the same time.  In addition, upon information and belief, Wang was aware that the fractures were consistent with the popping sound Jill and Michael had reported hearing in G.J.'s chest since February 26, 2010.

68.     Upon information and belief, Wang also asked one of the radiologists to review the x-ray films taken on February 24, 2010.  The radiologist concluded that while the right rib fractures could have been present on February 24, 2010, the left rib fractures, which were displaced in the x-rays taken on March 5, 2010, and thus more pronounced, were new and not present on February 24, 2010.  Both the radiologist and Wang apparently failed to account for, or intentionally ignored, the symmetrical nature of the fractures, which suggests that the fractures occurred simultaneously and not at different times.  They also failed to account for, or intentionally ignored, the fact that it is common for rib fractures in infants to be present but not discernible on x-rays for a matter of days.

CALDWELL
LESLIE &
PROCTOR

-15-

69.     At approximately 1:00 p.m., Jill met Wang for the first time when Wang arrived to examine G.J. and interview Jill.  During the interview, Jill's sister, who had arrived to bring Jill lunch, was not permitted into the office where the interview took place.

70.     Wang interviewed Jill for approximately twenty minutes, during which Wang asked Jill to recount the events of February 24, 2010, and describe in detail how she had fallen down the stairs.  Jill explained to Wang that she did not have a clear recollection of how she had fallen or where G.J. had hit the steps.  Jill noted that she had a bruise on her right arm and surmised that she had extended her right arm to catch herself during the fall.  Wang also examined G.J. and later testified that she had felt the popping in G.J.'s chest during that examination.  At no time during her interview did Wang inform Jill that she suspected that G.J. was a victim of child abuse.

71.     After the interview, Wang left the office where the interview took place but instructed Jill to remain at the office until she returned.  Wang was gone for over an hour, during which time Jill and her sister, for the first time, grew suspicious of Wang's motives for examining G.J. and questioning Jill.

### *UCLA-Westwood Calls SMPD*
### *to Report G.J. as a Victim of Child Abuse*

72.     Upon information and belief, at approximately 2:00 p.m., Wang, or an individual acting on Wang's instruction, contacted the SMPD to report that G.J. was a victim of child abuse.  This report was made without giving any notification to Jill that she was suspected of abusing G.J.

73.     Shortly thereafter, Defendants and Santa Monica police officers Defendants Russell Grimmond (#3487) and Peter Zamfirov (#3719) were dispatched to UCLA-Westwood, where they first spoke with Wang regarding her allegations.  According to the police report later drafted by Zamfirov, Wang reported that, prior to examining G.J., she suspected G.J. was a victim of child abuse

CALDWELL
LESLIE &
PROCTOR

because G.J.'s skull fracture was not consistent with the fall described by Jill and also because of Jill's and Michael's interaction with Beerman, following which Jill expressed interest in seeing a family therapist regarding the accident.  According to the police report, because of this suspicion, Wang recalled Jill to UCLA-Westwood for further testing on March 5, 2010, when they discovered the rib fractures.  While Wang conceded that the right-side rib fractures may have been present on February 24, 2010, she reported to the police officers that she was "certain the ribs on the left were not fracture [*sic*] during the previous visit to the hospital."

74.    Following their conversation with Wang, Grimmond and Zamfirov interviewed Jill for over an hour, during which, according to Zamfirov, Jill was "very cooperative and calm."  Jill answered all of the questions posed to her by the officers.  At no time did the officers inform Jill that she was a suspect in a child abuse investigation or that she had a right to counsel prior to being interviewed.

75.    At one point during Jill's interview by Grimmond and Zamfirov, Wang entered the room to challenge Jill's account of how she received a bruise on her arm. Grimmond and Zamfirov permitted Wang to interrogate Jill, under their apparent authority, about her account of the events on February 24, 2010.

76.    After learning that Jill was still at the hospital, eight hours after she had arrived, for what Michael believed was a routine check-up for G.J., Michael left work and went to the UCLA-Westwood clinic.  Grimmond and Zamfirov interviewed Michael about Jill's fall.  Michael explained that he was not at home when the accident occurred but, according to Zamfirov's police report, Michael "spoke very highly of [Jill] and said she has never been abusive towards G.J.  I asked him if he thought the incident might have been deliberate.  He said no."

77.    Upon information and belief, Grimmond concluded that G.J.'s injuries were consistent with the accident described by Jill and that there were no grounds for arresting Jill for child abuse, nor were there sufficient grounds for officers to take G.J. into protective custody.

*After SMPD Refuses to Detain G.J., UCLA-Westwood Calls*
*DCFS to Report G.J. as a Victim of Child Abuse, and Wang*
*Seeks to Prevent G.J. from Leaving UCLA-Westwood*

78.     At approximately 4:30 p.m., while Grimmond and Zamfirov continued to investigate Wang's allegations, Wang, or, upon information and belief, someone at Wang's direction, made a child abuse report to DCFS.  According to a DCFS intake report, the individual reported that the police officers investigating the matter would not be taking G.J. into protective custody.

79.     Upon information and belief, after Wang learned that officers would not take G.J. into protective custody (after finding no legal grounds to do so), Wang devised a plan to keep G.J. at the hospital, under the guise of needing to perform critical medical tests, until a DCFS social worker arrived, whom, upon information and belief, Wang presumed would comply with her unfounded desire to remove G.J. from his parents' custody.

80.     Wang thus ordered G.J. to undergo another CT scan of his head at 4:50 p.m., despite, upon information and belief, there being no medical basis for requesting the additional CT scan.  Upon information and belief, Wang falsely suggested to Jill that G.J. may have suffered brain damage in order to induce Jill to agree to further testing for G.J.  Jill and her sister raced G.J. to the CT clinic, arriving shortly before it closed.  The repeat CT scan did not reveal any additional injuries.

81.     Following the CT scan, upon information and belief, Wang advanced her plan to detain G.J. by instructing Jill that G.J. urgently needed to have additional blood tests performed and that, because all of the clinics were now closed, G.J. would need to be taken to the emergency room at UCLA-Westwood for the tests.  Even though Wang represented that the tests needed to be taken immediately so that she could receive the results in a matter of days, upon information and belief, Wang was aware that the results for some, if not all, of the tests ordered, would not be

CALDWELL
LESLIE &
PROCTOR

-18-

1  available for weeks and were not urgent.  Wang also told Jill she was concerned that

2  G.J. had additional fractures in his legs, even though Wang, upon information and

3  belief, knew that the x-rays had shown that G.J.'s legs were normal physiologically.

4       82.    Upon information and belief, Wang sought to detain G.J. at the hospital

5  over the weekend to have hospital staff closely observe G.J., Jill, and Michael in the

6  hope of gathering further circumstantial evidence that would support Wang's

7  unfounded allegations of child abuse.

8       ***Jill and Michael Are Forced, Under Duress, to Bring G.J.***

9       ***to the UCLA-Westwood Emergency Room for Further Tests***

10      83.    Although Jill and Michael simply wanted to take G.J. home rather than

11 force him to endure further unnecessary tests, Jill and Michael felt they had no

12 option but to comply because (a) the police officers escorted them to the emergency

13 room with Wang's assistant; (b) the officers remained at the office and suggested

14 that Jill and Michael permit additional tests to be conducted on G.J.; and (c) Wang

15 falsely claimed that the blood tests were urgent and medically necessary.

16 Exemplifying the duress suffered by Jill and Michael, Grimmond and Zamfirov,

17 along with Wang's staff, escorted Jill, Michael, and G.J. to the emergency room at

18 approximately 6:30 p.m., nearly twelve hours after G.J. had arrived that morning for

19 "routine tests."

20      84.    Upon information and belief, after escorting G.J. to the emergency

21 room to ensure that he would remain in the hospital's control, despite there being no

22 valid legal or medical basis for his hospitalization, Grimmond and Zamfirov left the

23 hospital and referred the matter to detectives in the SMPD for further investigation.

24      85.    Upon being admitted to the hospital, two nurses attempted

25 unsuccessfully to put an IV into G.J.  Jill and Michael demanded to speak with a

26 physician, and Dr. Richelle Cooper arrived in their room.  Cooper stated that G.J.

27 did not require an IV but that Wang had ordered he stay in the hospital.  When Jill

28 and Michael asked when they could leave, Cooper answered that she would have to

CALDWELL
LESLIE &
PROCTOR

-19-

1 | check with Wang as only Wang could provide clearance.  The Joneses were then left
2 | unattended for hours.

3 | ### *DCFS Arrives to Conduct an Investigation into Wang's Claims*

4 | 86.     Following Wang's call to DCFS to report her allegation of child abuse,
5 | DCFS assigned Defendant Shawn Rivas, a child social worker, to the matter at 7:45
6 | p.m., and Rivas arrived at UCLA-Westwood at approximately 9:40 p.m. on March
7 | 5, 2010.  Upon information and belief, Rivas first interviewed the treating
8 | physicians, including Cooper.  Upon information and belief, Cooper told Rivas that
9 | it was not necessary for G.J. to be hospitalized and that he could return home and
10 | have the requested blood tests completed on the following Monday.

11 | 87.     Upon information and belief, soon after Rivas's arrival at the hospital,
12 | Defendant Susan Land, a UCLA social worker, requested that Rivas issue a hospital
13 | hold for G.J., pursuant to California Welfare & Institutions Code § 309(b).  A
14 | hospital hold permits DCFS to take a child into temporary custody, and out of the
15 | custody of the parents, when certain conditions are met.  In order for a DCFS social
16 | worker to issue a hospital hold without the consent of the parents and without a
17 | court order, the social worker must, along with his DCFS supervisor, conclude that
18 | the child is in imminent danger of serious bodily injury and the child's safety cannot
19 | be secured through less intrusive means.  Upon information and belief, Rivas
20 | inquired whether G.J.'s injuries were non-accidental, and Land could not provide a
21 | definitive answer.  Thus, upon information and belief, Land improperly sought a
22 | hospital hold at the direction of Wang, even though Land could not state definitively
23 | whether G.J.'s injuries were non-accidental, much less that G.J. was in imminent
24 | danger of suffering serious physical harm.

25 | 88.     Upon information and belief, Rivas sought clarification regarding the
26 | hospital's findings from Wang, and Cooper arranged for Rivas to speak with Wang
27 | by phone.  Rivas was unable to speak with Wang in person because Wang had left
28 | the hospital without informing the Joneses that she was leaving for the weekend, or

CALDWELL
LESLIE &
PROCTOR

-20-

1   providing any explanation about the tests she had ordered for G.J.  Upon

2   information and belief, Wang refused to state whether G.J.'s injuries were non-

3   accidental or accidental.  Upon information and belief, Rivas inquired as to whether

4   G.J. could be transferred to University of Southern California Hospital for a second

5   opinion, which he hoped would be more definitive.  Upon information and belief,

6   Wang refused this request and insisted that G.J. stay at UCLA, where she would

7   have more control over the investigation into his injuries.  Upon information and

8   belief, despite lacking any legitimate medical reason to have G.J. hospitalized,

9   Wang ordered that G.J. remain at UCLA-Westwood emergency room overnight and

10  then be transferred to the UCLA-Santa Monica the following day.

11        89.    Upon information and belief, although Rivas believed there was no

12  legitimate medical reason for G.J. to remain hospitalized, and despite the fact that no

13  one had definitively concluded that G.J.'s injuries were non-accidental, much less

14  that G.J. was at imminent risk for suffering serious physical harm, Rivas agreed to

15  Wang's plan to keep G.J. hospitalized over the weekend.

16        90.    Rivas interviewed Jill and Michael, who both recounted again the

17  events of February 24, 2010.  Jill and Michael were both under duress during the

18  interview by Rivas due to the fact that G.J. had spent over twelve hours at the

19  hospital, and no one had adequately apprised the Joneses of G.J.'s medical

20  conditions, or the purpose of the investigation by Wang or DCFS.  Moreover, no

21  one expressly told the Joneses that they were the focus of a child-abuse investigation

22  and that they were entitled to the advice of counsel prior to making additional

23  statements.

24        91.    After speaking with the Joneses, Rivas, upon information and belief,

25  spoke with Grimmond and/or Zamfirov, who stated that they found no grounds to

26  detain G.J. based upon the evidence presented.

27        92.    The Joneses waited to receive instructions from Rivas regarding

28  whether they would be allowed to leave the hospital and return home after an

arduous day.  Rivas had a duty to independently evaluate the evidence and reach an independent conclusion as to whether there were valid grounds to detain G.J., which there were not.  Absolutely no one, including hospital staff or investigating police officers, had expressly concluded that G.J.'s injuries were non-accidental.  Indeed, upon information and belief, Rivas concluded that there was no basis to remove G.J. from the custody of his parents on March 5, 2010.

93.    Rivas, however, abdicated his duties and, instead of informing the Joneses that they were free to leave because there was no basis to detain them at the hospital, Rivas told Jill and Michael that they should follow Wang's instructions or that he would detain G.J. based upon the Joneses' failure to follow medical advice. Thus, although Rivas later testified that Jill and Michael consented to G.J. remaining at the hospital over the weekend, to the extent they did consent, they did so based solely upon Rivas's express threat that he would improperly detain G.J. if the Joneses attempted to leave the hospital.

94.    Jill and Michael refused to leave their son alone at the hospital and spent the night at his bedside.  Rivas thus complied with Wang's desire to force G.J. to remain in the hospital, without medical need, until Tuesday, under the guise that the hospital would complete tests that would definitively determine whether G.J.'s injuries were accidental or not.

### G.J. Is Transferred to UCLA-Santa Monica and Remains Hospitalized Without a Valid Medical Reason

95.    On the morning of March 6, 2010, G.J. was transferred by ambulance—for no reason other than to ensure that G.J. was not in the sole custody of his parents—to UCLA-Santa Monica, where he was admitted ostensibly to have certain tests conducted that would determine whether his injuries were non-accidental, even though, upon information and belief, there was no medical reason for G.J. to be hospitalized.

CALDWELL
LESLIE &
PROCTOR

-22-

96.   Upon information and belief, the hospital arranged for a monitor to observe Jill and Michael at all times in an attempt to develop evidence of strife between Jill and Michael that would support Dr. Wang's false allegations.  In addition, the hospital advised Jill that she was suspected of physically abusing her son, and Jill was not allowed to be alone with G.J.

97.   In addition, UCLA-Santa Monica placed an alarm bracelet around G.J.'s ankle that alerted hospital staff of any attempt to remove G.J. from the hospital, which furthered Jill's and Michael's impression that they were required to keep G.J. hospitalized despite the lack of medical necessity.

98.   The Joneses tried throughout the day on March 6, 2010 to contact Wang and Rivas to receive an explanation as to why they could not take G.J. home. They continued to believe, based upon the false representations made by Wang, that there was a medical reason for G.J. to remain in the hospital, which there was not. Rivas called the hospital room and repeated his instruction that the Joneses should comply with Wang's orders until she completed *her* investigation.  Jill and Michael understood, based upon the representations made by Wang, Rivas, and other hospital staff, that if they attempted to take G.J. from the hospital, they would be viewed as refusing medical treatment and DCFS would remove G.J. from their custody on that basis.

### *UCLA-Santa Monica Seeks a Hospital Hold on*
### *Rivas's Day Off Based on No New Evidence*

99.   Upon information and belief, on the following day, March 7, 2010, a social worker at UCLA-Santa Monica called the DCFS hotline and spoke with Defendant Deborah Ramirez, a senior child social worker, to report that the SCAN team had concluded, erroneously, that G.J.'s rib fractures were not present when he was admitted on February 24, 2010, and they therefore suspected G.J. was a victim of child abuse.  The social worker requested that Ramirez issue a hospital hold.

CALDWELL
LESLIE &
PROCTOR

100.   Upon information and belief, the physician who sought the hospital hold did so at the direction of Wang, despite the fact that the hospital had not received the results of the tests that were purportedly used to determine whether G.J.'s injuries were accidental.  Upon information and belief, Wang directed the social worker to request a hospital hold even though Wang had no additional evidence regarding G.J.'s injuries than she had the prior day when she was unable to conclude whether G.J.'s injuries were accidental.  Upon information and belief, Wang instructed her colleagues to call the DCFS hotline on March 7, 2010, because she knew that Rivas was not working on that day and she believed it would be easier to obtain a hospital hold from a DCFS social worker other than Rivas.

101.   Upon information and belief, even though Rivas, the case worker with the most information concerning G.J.'s injuries, did not believe issuance of a hospital hold was warranted under the facts available at that time, Ramirez, issued a hospital hold without conducting an independent investigation or even consulting with Rivas.  Upon information and belief, Ramirez agreed to issue a hospital hold despite the fact that she failed to establish that G.J. was in imminent danger of serious bodily injury.

102.   Upon information and belief, although Ramirez authorized the hospital hold and filled out the necessary paperwork to issue a hospital hold, Ramirez did not sign her name to the paperwork.  Instead, upon information and belief, Ramirez forged the signatures of Rivas and Rivas's supervisor, Defendant Yolanda Johnson, on the hospital hold form dated March 7, 2010 that authorized the temporary detention of G.J.

103.   Although DCFS issued an improper hospital hold on March 7, 2010, DCFS failed to immediately notify Jill and Michael that G.J. had officially been removed from their custody, which, upon information and belief, violated DCFS's policies.

CALDWELL
LESLIE &
PROCTOR

-24-

1  104.   Upon information and belief, once Rivas learned that a hospital had
2  been issued, he sought to have the hospital hold rescinded based upon a lack of
3  evidence to support the issuance of a hospital hold.  Upon information and belief,
4  Rivas's supervisor, Johnson, refused Rivas's request to rescind the issuance of the
5  unwarranted hospital hold, even though she failed to establish that G.J. was in
6  imminent danger of serious bodily injury.

7  105.   Upon information and belief, during the course of that weekend, Rivas
8  spoke with hospital staff at UCLA-Santa Monica and determined that the hospital
9  hold had been requested in error.  DCFS, however, failed to rescind the hospital
10  hold and continued to improperly detain G.J.

11  ***Rivas and Johnson Issue a Second Hospital Hold Without***
12  ***Establishing an Imminent Risk of Serious Bodily Harm***

13  106.   Upon information and belief, on the afternoon of Monday, March 8,
14  2010, Wang contacted Rivas by phone, and Rivas pressed Wang to come to a
15  conclusion regarding G.J.'s injuries.  Upon information and belief, Rivas had grown
16  increasingly frustrated regarding Wang's refusal to definitively state whether G.J.'s
17  injuries were non-accidental or accidental.  Faced with the prospect of G.J. being
18  released to his parents because of the lack of evidence to support her conclusory
19  allegation that G.J. had been abused, Wang abruptly asserted, without relying on any
20  additional information from what she had had on the prior Friday (March 5, 2010)
21  that G.J.'s injuries were "highly suspicious."

22  107.   Upon information and belief, at the point that Wang proclaimed that
23  G.J.'s injuries were "highly suspicious," Rivas was not presented with any
24  additional evidence concerning the nature of G.J.'s injuries.  Moreover, upon
25  information and belief, Rivas was aware that Wang had considered no additional
26  evidence prior to altering her conclusion to state that G.J.'s injuries were "highly
27  suspicious."  Finally, despite Rivas's numerous requests that Wang reach a
28  definitive conclusion regarding the nature of G.J.'s injuries, Wang refused to do so,

CALDWELL
LESLIE &
PROCTOR

-25-

1   because she knew that the evidence did not support such a conclusion.

2   Nevertheless, upon information and belief, Wang agreed to alter her conclusion

3   regarding G.J.'s injuries for the sole purpose of satisfying Rivas's need for a basis to

4   issue a hospital hold.

5        108.   Irrespective of Wang's willingness to modify her medical conclusions

6   regarding alleged child abuse on a whim, Rivas and Johnson completely abdicated

7   their duties by, upon information and belief, relying entirely on Wang's declaration

8   that the injuries were "highly suspicious" as a basis to issue a second hospital hold

9   (Rivas, upon information and belief, falsely believed that the first hospital hold had

10  been rescinded) to temporarily remove G.J. from the custody of his parents.  Upon

11  information and belief, neither Rivas nor Johnson had any reasonable basis to

12  believe that G.J. was in imminent risk of serious bodily injury if he were released to

13  the custody of his parents, and neither made any effort to determine if alternative,

14  less intrusive, measures were available rather than completely removing G.J. from

15  his parents' custody.

16       109.   Wang's and DCFS's allegations of child abuse rested entirely on their

17  purported belief that Jill's explanation that the rib fractures occurred during the

18  accidental fall was physically improbable based upon how G.J. reportedly fell down

19  the stairs.  Assuming, for a moment, that it was *unlikely* that the rib injuries occurred

20  during the fall, Wang, Land, Ramirez, Rivas, and Johnson failed to consider that

21  every other hypothesis of how the injuries occurred was even more improbable than

22  Jill's explanation.  If the rib fractures preceded the fall, the impact of the fall would

23  have displaced the rib fractures and they would have been apparent in the February

24  24, 2010 x-rays.  Because the fractures were not apparent in the February 24, 2010

25  x-rays, they must have occurred on or after February 24, 2010.  No one disputed

26  that, based upon the popping sound in G.J.'s chest and subsequent reviews of the x-

27  rays, the right-side fractures were present on February 26, 2010.  Given that the

28  fractures were bilateral and symmetrical, it was extremely likely they occurred

CALDWELL
LESLIE &
PROCTOR

1  simultaneously, thus making the accidental fall on February 24, 2010, the most
2  likely mechanism for the rib fractures.  Because Wang and DCFS were myopically
3  focused on refuting Jill's explanation, Defendants, collectively, overlooked the
4  simple logic that indicated that G.J.'s injuries were accidental.

5       110.  Although the investigation up to that point in time had focused on Jill's
6  care of G.J., Rivas temporarily removed G.J. from the custody of both Jill and
7  Michael because, according to Rivas and DCFS, Michael could not adequately
8  explain how G.J. sustained his injuries.  Upon information and belief, Rivas
9  believed there was no basis to seek the removal of G.J. from the custody of Michael
10 and did so solely at the direction of his supervisors, whom he did not believe had a
11 valid reason for seeking the removal of G.J. from Michael.

12      111.  Upon information and belief, the removal of G.J. from Michael's
13 custody pursuant to the hospital hold, separate and apart from G.J.'s removal from
14 Jill's custody, had absolutely no legal basis.

15               ***DCFS Conducts a TDM Regarding G.J.'s***
16            ***Custody, but Violates Its Own Procedures***

17      112.  Rivas scheduled a Team Decision Meeting ("TDM") for the next day,
18 Tuesday, March 9, 2010.  The TDM is a collaborative process used by DCFS to
19 determine a course of action for a detained child.  The TDM regarding G.J. took
20 place, as scheduled, on March 9, 2010, and included Rivas, Johnson, Jill, Michael,
21 some friends and family of the Joneses, and the TDM facilitator.  After a lengthy
22 discussion, in which the participants discussed Wang's allegations and the evidence,
23 *all* of the participants in the TDM agreed that the best course of action was for G.J.
24 to return home with Jill and Michael.

25      113.  Upon information and belief, because the participants in the TDM
26 reached a consensus that G.J. should be returned to the custody of his parents, that
27 plan should have been put into effect without further approval or consultation.
28 Upon information and belief, in violation of DCFS's own policies regarding TDMs,

CALDWELL
LESLIE &
PROCTOR

-27-

1   Johnson and the TDM facilitator contacted Defendant Asaye Tsegga, an Assistant

2   Regional Administrator for DCFS ("ARA") who summarily rejected the consensus

3   plan of the TDM and required that DCFS continue to detain G.J. in the hospital,

4   despite there being no medical reason for G.J. to remain hospitalized.

5         114.   Upon information and belief, DCFS's social workers and

6   administrators improperly pursued the detention of G.J., due, in part, to negative

7   press DCFS had received around that time criticizing DCFS for failing to protect

8   children in Los Angeles County from abuse, and DCFS did not want to create the

9   impression that it was favoring one of its own employees.

10             ***SMPD Detectives, along with Wang, Conduct a Custodial***

11      ***Interrogation of Jill Without Advising Jill of Her Right to Counsel***

12        115.   On the following day, March 10, 2010, SMPD detectives who had been

13   assigned to the case following Grimmond's and Zamfirov's initial investigation,

14   Defendants Leslie Trapnell and Lloyd Gladden, arrived at the hospital to gather

15   additional information about the case.

16        116.   According to their police report, Trapnell and Gladden first spoke with

17   Wang.  Upon information and belief, in an attempt to have criminal charges pressed

18   against Jill and Michael, Wang deliberately misled detectives regarding the nature of

19   G.J.'s injuries.  While the radiologists and Wang had previously concluded that

20   G.J.'s skull injury, although it involved two bones, occurred as a result of the

21   accidental fall, Wang asserted to the detectives, for the first time, that the "two

22   fractures do not appear related and occurred at two different times or at two different

23   hits to the head."  Upon information and belief, Wang knew this statement was

24   false, and she made it in a desperate attempt to secure baseless criminal charges

25   against Jill and Michael.

26        117.   Trapnell and Gladden next sought to interview Jill about the accident.

27   Trapnell and Gladden informed Jill that they wished to interview her about the

28   accident and suggested that if she did not cooperate with their investigation, it would

CALDWELL
LESLIE &
PROCTOR

1   be detrimental to her efforts to recover custody of G.J.  Especially in light of the fact

2   that a hospital hold had been issued and G.J. had been removed from her custody,

3   Jill believed that she was compelled to answer the questions posed by the detectives.

4        118.   Jill's interrogation, which occurred in a room with the detectives and

5   Wang, lasted for approximately an hour and a half.  At no time during the interview

6   did Trapnell or Gladden inform Jill that she had the right to counsel during the

7   interview.

8        119.   Rather than conduct an independent investigation in an effort to

9   evaluate the facts of the case objectively, Trapnell and Gladden permitted Wang—

10   Jill's and Michael's chief accuser—into the interview room and, moreover,

11   permitted Wang to ask the majority of the questions to Jill, including accusatory

12   questions that indicated that Jill was the target of the investigation and further

13   confirmed Jill's belief that she was not permitted to leave the interrogation.

14        120.   Trapnell and Gladden abdicated their duties and violated Jill's rights by

15   permitting Wang, under their authority, to question Jill about the accident..  Any

16   testimony obtained during the interview by Trapnell, Gladden, and Wang was

17   obtained under duress.

*Following the Hearing Concerning G.J.'s Temporary Detention,*

*the Commissioner Ordered G.J. Released to His Parents*

20        121.   A Detention Hearing for G.J. was held on March 11, 2010, before the

21   Honorable Jacqueline H. Lewis.  Upon information and belief, Commissioner Lewis

22   found DCFS's initial Detention Hearing Report to be inadequate and continued the

23   Detention Hearing to the following day to permit DCFS to submit additional

24   evidence in support of its allegation that G.J.'s injuries were non-accidental and that

25   G.J. should be temporarily removed from the custody of both of his parents pending

26   the trial.  Although she continued the hearing to permit DCFS to submit additional

27   evidence, Commissioner Lewis ordered that G.J.'s continued detention was not in

28   his best interest and ordered G.J. detained to the home of Jill's parents pending

CALDWELL
LESLIE &
PROCTOR

1   completion of the hearing, rather than to the hospital.  Commissioner Lewis also

2   permitted Jill and Michael to have monitored visits with G.J.

3       122.   During the Detention Hearing, Defendant Amir Pichvai, who, on behalf

4   of County Counsel, represented DCFS in the proceeding, advanced a new theory of

5   why G.J.'s injuries were non-accidental.  Upon information and belief, Pichvai

6   recognized that Wang's position that the left-side rib fractures were new while the

7   right-side rib fractures existed as of February 24, 2010, was implausible.  Instead,

8   Pichvai represented to the court that *all* of G.J.'s rib fractures were present when

9   G.J. was first admitted into UCLA-Santa Monica on February 24, 2010.  Pichvai

10  failed to recognize that his theory supported the Joneses' assertion that G.J.'s

11  injuries were accidental.  All parties agreed that if the fractures occurred during the

12  fall, they would be accidental in nature and would not support G.J.'s detention.  If

13  the rib fractures occurred before the accidental fall, the impact of the fall would

14  likely have displaced the fractures, and the rib fractures would have been readily

15  apparent in the x-ray taken on February 24, 2010.  Thus, because the fractures were

16  not apparent in the chest x-ray taken on February 24, 2010, the rib fractures,

17  according to Pichvai's own theory, were the result of the accident, and did not

18  justify G.J.'s detention.

19      123.   After considering the evidence presented by DCFS and hearing Jill's

20  testimony during the Detention Hearing, Commissioner Lewis concluded that DCFS

21  had failed to establish a *prima facie* case of child abuse and therefore ordered that

22  G.J. be returned to the custody of his parents pending the trial on DCFS's

23  allegations.

24      124.   DCFS then requested that Commissioner Lewis stay her order pending

25  DCFS's appeal of her order.  Commissioner Lewis noted that, while she has stayed

26  her orders pending appellate court review in the past, she would not do so here and

27  ordered that G.J. be released immediately to his parents pending trial.

28

CALDWELL
LESLIE &
PROCTOR

1   125.   Despite the fact that Wang and other physicians ordered tests and other

2   medical procedures performed on G.J. without the Joneses' consent even though

3   they were in no way medically necessary, the Joneses have received medical bills

4   from UCLA-Santa Monica and UCLA-Westwood totaling approximately $21,945

5   related to G.J.'s hospitalization between March 5 and 11, 2010.

6   ### County Counsel Seeks a Writ of Mandate and

7   ### Misrepresents the Record to the Court of Appeal

8   126.   Unsatisfied with the prospect of G.J. returning to his parents, County

9   Counsel filed a Petition for Writ of Mandamus and Request for Immediate Stay on

10   March 15, 2010 (the "Writ Petition"). In the Writ Petition, Pichvai falsely asserted

11   that "[t]here was uncontroverted medical evidence before the court that the

12   mechanism of the reported fall was not consistent with G.J.'s injuries—that is, G.J.

13   could not have suffered his skull fracture and symmetrical rib fractures on both sides

14   from the same fall." Pichvai was well aware that Wang merely testified that the rib

15   injuries were "highly suspicious" and that the rib injuries "were not easily

16   explained" by the fall. This uncertainty regarding the cause of the rib injuries does

17   not reflect "uncontroverted evidence" that G.J.'s injuries were non-accidental.

18   127.   Based, presumably in part, on the false assertions made by Pichvai in

19   the Writ Petition, the same day it was filed and before Jill, Michael, and G.J. could

20   submit an opposition, the Court of Appeal granted the Writ Petition and ordered G.J.

21   to be detained with his maternal grandparents pending the trial, which began on

22   April 15, 2010. During the detention, Jill and Michael were permitted monitored

23   visits to G.J. at his grandparent's house, but they were not permitted to stay

24   overnight.

25   128.   Because of the forced separation between Jill and G.J., Jill was unable

26   to maintain her milk production, and she soon lost the ability to breastfeed G.J.,

27   despite the fact that G.J. was less than four months old. This loss of her ability to

28   breastfeed her son at such a young age was emotionally traumatic for Jill and G.J.

CALDWELL
LESLIE &
PROCTOR

-31-

***Following the Full Trial, Commissioner Lewis Lambasts Wang***
***and Orders G.J. Released to His Parents Immediately***

129.   While the trial began on April 15, 2010, the Court's schedule did not permit the trial to continue on consecutive days, and the Court heard evidence over six days, ending on May 3, 2010.  During these months, Michael was forced to take a leave of absence from work.  Jill was on unpaid maternity leave, and had to ask for additional time off through the duration of the trial.  In addition, Jill and Michael suffered, on a daily basis, the humiliation of facing friends and family members who were aware that Jill and Michael were accused of abusing their son.

130.   The stress of being falsely accused of child abuse manifested itself in severe emotional distress and other psychological injuries.

131.   During the trial, Wang again revised her theory of G.J.'s injuries.  Rather than definitively state that the left-side rib fractures occurred after February 24, 2010, as she had alleged in her medical report submitted at the Detention Hearing, Wang, in response to the question, "Is it your opinion that the rib fractures were sustained at the same time or not?" answered, "That is difficult to say.  I'm not sure."  In fact, Wang testified that Jill's reporting of popping sounds in G.J.'s chest "made me assume that on February 24th one or all rib fractures could have been there."  Wang also no longer asserted that the skull fractures occurred at different times or were not the result of the accidental fall.  Wang's sworn testimony at trial thus flatly contradicts her summary conclusions that formed the basis for detaining G.J. in March 2010.  While the intervening time before trial may have provided Wang with time to reflect on her medical conclusions and recognize that they were nonsensical, the damage of her crusade to force the unwarranted separation of G.J. from his parents had already been done.

132.   The Court heard testimony from the Joneses' medical expert, who offered the only plausible explanation for G.J.'s rib fractures.  Contrary to Wang's summary conclusion that the rib fractures could not have occurred as part of the

CALDWELL
LESLIE &
PROCTOR

1  accidental fall, Dr. Thomas Grogan, an esteemed pediatric orthopedic surgeon,

2  surmised, based upon his review of G.J.'s medical records, that Jill had reflexively

3  squeezed G.J. between her left arm and chest as she fell and that this caused the rib

4  fractures before G.J. fell out of her arm and hit his head on the stair below.

5      133.   At the conclusion of the trial, Commissioner Lewis found the evidence

6  "overwhelming" that a "horrific accident" had taken place.  Commissioner Lewis, in

7  exonerating Jill and Michael, stated, "[T]his is the first time in 20 years I've seen . . .

8  [that] the parents' story has remained consistent and the doctor's stories have

9  changed over and over and over again to try to unmatch the parents' story."  She

10  stated further that the proceedings were "a credibility call for Wang.  The stories of

11  the injuries and what they were, and how they occurred changed so many times

12  from the date of the original detention hearing to the next day; from that date to

13  reports she made; to her testimony, even on the witness stand."

14      134.   This travesty of justice resulted in the deprivation of the rights of Jill,

15  Michael, and G.J. to be together as a family at home for more than two months.  The

16  disruption and distress this caused for all three of them was overwhelming and

17  continues to have lasting effects to this day.

18                    **FIRST CAUSE OF ACTION**

19  **(False Imprisonment by G.J. Against Claudia Wang and Susan Land, in Their**

20  **Individual Capacities, Shawn Rivas, Deborah Ramirez, Yolanda Johnson,**

21  **Asaye Tsegga, Russell Grimmond, and Peter Zamfirov, in Their Individual and**

22  **Official Capacities, Los Angeles County Department of Children and Family**

23  **Services, County of Los Angeles, City of Santa Monica Police Department, City**

24  **of Santa Monica, and DOES 2-20)**

25      135.   Plaintiffs re-allege and incorporate by reference each and every

26  allegation contained in paragraphs 1 through 134, inclusive.

27      136.   G.J. was unlawfully detained, without the free and voluntary consent of

28  either G.J. or his parents, and without legal privilege, on the following occasions:

CALDWELL
LESLIE &
PROCTOR

a.     On March 5, 2010, Wang informed G.J.'s parents that G.J. was required to be admitted to UCLA-Westwood hospital, even though there was no medical necessity for G.J. to be hospitalized and G.J.'s parents were under no legal obligation to admit G.J. to the hospital.  Wang, Grimmond, and Zamfirov stated that if G.J.'s parents did not agree to admit him into the hospital, then G.J. would likely be removed from their custody based upon their refusal to agree to unnecessary medical treatment.  G.J.'s parents thus consented under duress and not of their free will to G.J. being admitted to UCLA-Westwood hospital.  Grimmond and Zamfirov escorted G.J. and his parents to the UCLA-Westwood emergency room, which furthered G.J.'s parents' belief that they had no choice but to comply with Wang's demand for hospitalization.

b.     From March 5, 2010 through March 11, 2010, Wang, Land, Ramirez, Rivas, and Johnson conspired to improperly detain G.J. at UCLA-Westwood and UCLA-Santa Monica by informing G.J.'s parents that if they did not comply with Wang's orders to keep G.J. hospitalized, G.J. would be removed from their custody for their refusal of medical treatment.  Upon information and belief, Wang, Land, Ramirez, Rivas, and Johnson each knew that there were no valid legal or medical grounds to require G.J. to be hospitalized, and their threats to G.J.'s parents were intended to keep G.J. improperly detained.

c.     Upon information and belief, on March 7, 2010, Ramirez, as an agent of DCFS, improperly issued a hospital hold, thereby detaining G.J., despite the fact that there were no exigent circumstances that justified G.J.'s temporary detention.  Upon information and belief, Ramirez knew that the requirements for a hospital hold were not satisfied and/or recklessly disregarded the legal requirements for issuing a hospital hold.  Moreover, upon information and belief, Ramirez forged the signatures on the hospital hold she issued.

d.     On March 8, 2010, Rivas and Johnson, as agents for DCFS, improperly issued a hospital hold, thereby detaining G.J., despite the fact that there

CALDWELL
LESLIE &
PROCTOR

1   were no exigent circumstances that justified G.J.'s temporary detention.  Upon

2   information and belief, Rivas and Johnson knew that the requirements for a hospital

3   hold were not satisfied and/or recklessly disregarded the legal requirements for

4   issuing a hospital hold.

5              e.      On March 9, 2010, Tsegga, as an agent of DCFS, improperly

6   rejected the consensus recommendation of the TDM to permit G.J. to return home

7   with his parents.  Instead, Tsegga improperly required G.J. to remain detained

8   pending the Detention Hearing.

9              f.      In his Application for a Writ, Pichvai failed to disclose

10  exculpatory evidence to the Court of Appeal by asserting that "[t]here was

11  uncontroverted medical evidence before the court that the mechanism of the

12  reported fall was not consistent with G.J.'s injuries—that is, G.J. could not have

13  suffered his skull fracture and symmetrical rib fractures on both sides from the same

14  fall."  In addition, Pichvai submitted as evidence the hospital hold issued, upon

15  information and belief, by Ramirez, which Pichvai, upon information and belief,

16  knew or should have known was forged.

17      137.   Upon information and belief, Ramirez, Rivas, Johnson, and the ARA,

18  in concluding that there were valid grounds for the temporary detention of G.J.

19  identified in Paragraph 136, failed to exercise due care in performing their

20  ministerial duties to investigate claims of child abuse.

21      138.   The County of Los Angeles is vicariously liable for the conduct of the

22  employees Ramirez, Rivas, and Johnson under California Government Code

23  § 815.2.

24      139.   As a direct result of each of the incidents listed in Paragraph 136, G.J.

25  was physically and emotionally injured.

26      140.   Wang, Land, Thomas, Ramirez, Rivas, Johnson, and the ARA acted

27  with malice with the intent to cause injury to G.J. and/or acted with a willful and

28  conscious disregard of G.J.'s rights in a despicable manner.  In addition, upon

CALDWELL
LESLIE &
PROCTOR